UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

STANLEY MARTIN COMPANIES, INC.

       Plaintiff,

v.

UNIVERSAL FOREST PRODUCTS
SHOFFNER LLC,

       Defendant.

CASE NO. 8:04-cv-00597-AW

Judge Alexander Williams

## PLAINTIFF STANLEY MARTIN COMPANIES, INC.'S OPPOSITION TO DEFENDANT UNIVERSAL FOREST PRODUCTS SHOFFNER LLC'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iv

I.  INTRODUCTION ..................................................................................................... 1

II. STATEMENT OF FACTS ......................................................................................... 5

   A.  The Quince Orchard Park Development. ................................................... 5

   B.  The Stanley Martin/Shoffner Contract. ...................................................... 7

   C.  The Shoffner Trusses ................................................................................... 9

   D.  Homeowners Discover Mold. ....................................................................... 12

   E.  The Shoffner-supplied trusses were delivered with elevated moisture
       levels, and were therefore unduly susceptible to mold growth. ............... 14

   F.  Remediation. ................................................................................................ 16

   G.  Homeowners sue. ......................................................................................... 17

   H.  Stanley Martin and Shoffner entered into a Tolling Agreement .............. 17

   I.  Shoffner has experienced moldy trusses on other projects, but refused
       to answer interrogatories asking for this information. ............................... 18

   J.  Stanley Martin filed this lawsuit against Shoffner to recover the
       remediation costs. ........................................................................................ 18

III. SUMMARY JUDGMENT STANDARD ................................................................ 18

IV. ARGUMENT .............................................................................................................. 20

   A.  Significant genuine issues of material fact exist concerning Stanley
       Martin's breach of contract and negligence counts precluding
       summary judgment. ..................................................................................... 20

       1.  Stanley Martin's evidence establishes that Shoffner's trusses
           were unduly susceptible to mold growth when Shoffner
           delivered them. ................................................................................. 20

           i.   Expert testimony as to possible causes ............................... 22

           ii.  Mold began to grow a short time after the sale ................. 23

           iii. Same accidents in similar products ..................................... 23

ii

           iv.    Elimination of other causes of the accident .....................................24

           v.     The type of accident does not happen without a defect .................25

           vi.    Summary .............................................................................................26

     2.    None of Shoffner's authorities change this result.........................................26

     3.    Dr. Elliott Horner, Stanley Martin's expert, can withstand a
            Daubert challenge. ..............................................................................27

  B.    The evidence establishes that Shoffner's negligence caused the mold
        growth on the trusses. ..........................................................................28

  C.    Stanley Martin's evidence establishes that Shoffner breached its
        Contract.................................................................................................33

  D.    There is also a genuine dispute of material fact concerning arbitration. ..............36

V.    CONCLUSION.................................................................................................40

DC #193102 v3

## TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................19

*Baltimore Transit Co. v. State ex rel. Castranda*, 194 Md. 421, 71 A.2d 442 (1950)...................32

*Banks v. Iron Hustler Corp.*, 59 Md. App. 408, 475 A.2d 1243 (1984).......................28

*Brady v. Southern Railway Co.*, 320 U.S. 476 (1943) ....................................19

*Cadem v. Nanna*, 243 Md. 536, 221 A.2d 703 (1966).....................................38

*Campbell v. Montgomery County Board of Education*,
    73 Md. App. 54, 533 A.2d 9 (1987)..............................................28, 32

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................18

*Chew v. DeVries*, 240 Md. 216, 213 A.2d 742 (1965) ...................................39

*Cornell Drilling Co. v. Ford Motor Co.*, 359 A.2d 822 (Pa. Super. Ct. 1976)...........................22

*Eisenberg v. Air Conditioning, Inc.*, 225 Md. 324, 170 A.2d 743 (1961) ...................................39

*Environmental Elements Corp. v. Mayer Pollack Steel Corp.*,
    497 F. Supp. 58 (D. Md. 1980)..................................................35

*Faith v. Keefer*, 127 Md. App. 706, 736 A.2d 422 (1999) ...................................29, 32

*Federal Savings & Loan Insurance Corp. v. Williams*, 599 F. Supp. 1184
    (D. Md. 1984) ..............................................................19

*First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253 (1968) ...................................19

*Fowler v. Smith*, 240 Md. 240, 213 A.2d 549 (1965).....................................28

*Fraser v. Merril Lynch Pierce Fenner & Smith, Inc.*, 817 F.2d 250 (4th Cir. 1987) .....................36

*Fusco v. G.E. Government Services, Inc.*, 897 F. Supp. 926 (D. Md. 1995)...................................19

*Harrison v. Bill Cairns Pontiac of Marlow Heights, Inc.*,
    77 Md. App. 41, 549 A.2d 385 (1988)...........................................3, 22, 23

*Heaton v. Ford Motor Co.*, 435 P.2d 806 (Or. 1967) .....................................23, 26

*Hill v. Wilson*, 134 Md. App. 472, 760 A.2d 294 (2000) ...................................32

*Hughes v. Thurman*, 213 Md. 169, 131 A.2d 479 (1957)...................................39

DC #193102 v3

*Jensen v. American Motors Corp.*, 50 Md. App. 226, 437 A.2d 242 (1981)..................................27

*Lee v. Baxter Healthcare Corp.*, 721 F. Supp. 89 (D. Md. 1989).....................................19

*Mattingly Lumber Co. v. Equitable Building & Savings Association*,
   176 Md. 403, 5 A.2d 458 (1939) ...........................................................39

*Maxum Foundations, Inc. v. Salns Corp.*, 779 F.2d 974 (4th Cir. 1985) .........................................36

*Otis Elevator v. LePore*, 229 Mo. 52, 181 A.2d 659 (1962) .................................................22

*Reed v. Sears, Roebuck & Co.*, 934 F. Supp. 713 (D. Md. 1996)..............................................21, 22

*Ross v. Communications Satellite Corp.*, 759 F.2d 355 (4th Cir. 1985)................................................19

*Sanders v. Williams*, 209 Md. 149, 120 A.2d 397 (1956)..................................................32

*Smith v. Butler*, 19 Md. App. 467, 311 A.2d 813 (1973)..................................................34

*Tucker v. KFC National Management Co.*, 689 F. Supp. 560 (D. Md. 1988)................................19

*University National Bank v. Wolfe*, 279 Md. 512, 369 A.2d 570 (1977) ........................................33

*Virgil v. "Kash N' Karry" Service Corp.*, 61 Md. App. 23, 484 A.2d 682 (1984).......22, 23, 26, 27

*Walker v. Department of Human Resources*, 379 Md. 407, 842 A.2d 53 (2004)..........................39

*Watson v. Sunbeam Corp.*, 816 F. Supp. 384 (D. Md. 1993) ........................................23, 24, 25, 26

## Statutes and Regulations

9 U.S.C. § 3..................................................................................................44

Fed. R. Civ. P. 56(c) ......................................................................................18

UCC § 2-607 .................................................................................................40

DC #193102 v3

**Stanley Martin Companies, Inc.**
**v. Universal Forest Products Shoffner, LLC**
Case No. AW-040597

## APPENDIX OF EXHIBITS

Exhibit A     Affidavit of Steven B. Alloy
              Exhibit SBA-1          Agreement between Stanley Martin Companies, Inc. and Shoffner Industries, Inc.

Exhibit B     Affidavit of Michael S. McNamara
              Exhibit MSM-1          Excerpts of Deposition of Andrew Pitman
              Exhibit MSM-2          Excerpts of Deposition of Steven B. Alloy
              Exhibit MSM-3          Excerpts of Deposition of Robert Maze, Jr.
              Exhibit MSM-4          Excerpts of Deposition of James Brent Holcomb
              Exhibit MSM-5          Excerpts of Deposition of Matthew Cooper
              Exhibit MSM-6          Tolling Agreement

Exhibit C     Declaration of Matthew Cooper
              Exhibit MC-1           Photographs

Exhibit D     Answers to Interrogatories by Universal Forest Products Shoffner, LLC

Plaintiff Stanley Martin Companies, Inc. ("Stanley Martin"), by its undersigned attorneys, hereby submits its opposition to Defendant Universal Forest Products Shoffner, LLC's ("Shoffner") Motion for Summary Judgment. As demonstrated below, Shoffner fails to submit any undisputed facts that would entitle it to judgment as a matter of law. To the contrary, all the material facts at issue in this case are disputed and must be decided by a trier of fact.

## I.   INTRODUCTION

Stanley Martin is a developer and homebuilder with its principal place of business in Reston, Virginia. In 1999, Stanley Martin bought wood trusses from Shoffner to be used in the construction of 24 duplex townhomes in the Quince Orchard Park development, Gaithersburg, Maryland (the "Project"). After the buyers moved into their homes, one homeowner discovered mold on certain Shoffner-supplied wood trusses. Soon thereafter, other homeowners noticed mold on trusses in their homes. Stanley Martin advised Shoffner of these complaints, and together with the City of Gaithersburg undertook an investigation.

The investigation ultimately revealed that not just one home—but all 24 homes—had mold growing on the floor trusses. Significantly, there was no mold growth on the wood building materials adjacent to or abutting these trusses throughout the homes, including the adjacent subflooring and word framing materials (which were equally susceptible to mold growth). Equally as significant, there was no ongoing, continuous or systemic source of water intrusion that would have allowed just the trusses in all 24 homes to grow mold. Furthermore, there was no evidence that Stanley Martin's construction practices caused or contributed to the truss mold. To the contrary, standard construction practices were utilized to construct all 24 homes. All 24 homes were built under typical construction conditions—that is, nothing unusual occurred on the Project which could have possibly caused truss mold in all 24 homes. And, there was no evidence of delay in construction. In fact, floor trusses were installed within days of

delivery and each of these homes was built in a matter of months with all 24 being completed in a year period.

After thorough investigation of all 24 homes, an expert consultant, initially hired by the City of Gaithersburg, concluded that the Shoffner trusses were excessively moist and unduly susceptible to mold growth when they were delivered to the Project. Stanley Martin subsequently advised Shoffner that the trusses were the source of the mold and that trusses in all 24 homes required remediation. By the end of 2003, Stanley Martin had spent nearly $2 million remediating the mold. Pursuant to the Stanley Martin/Shoffner Contract, Stanley Martin demanded that Shoffner indemnify it for all remediation costs.

Despite the remediation effort, 14 of the 24 homeowners filed lawsuits against both Stanley Martin and Shoffner, all of which later settled. Stanley Martin then filed this action for breach of contract, negligence, indemnity and contribution against Shoffner seeking to recover the money it spent remediating the mold on the Shoffner-supplied trusses.

Shoffner makes four arguments in its motion for summary judgment, none of which entitles Shoffner to judgment as a matter of law. First, Shoffner argues that Stanley Martin cannot establish that the Shoffner-supplied trusses were unduly susceptible to mold growth when they were delivered. This is simply not true. The undisputed evidence shows that Shoffner never moisture tested its raw lumber when first purchased, or after the trusses were manufactured, or before they were delivered to Stanley Martin. It is undisputed that after manufacture, Shoffner put the trusses out in the yard, open to the elements. It is also undisputed that the trusses were then transported and ultimately delivered to Stanley Martin in open air flatbed trucks. It is also beyond good faith dispute that the parties' agreement required Shoffner

DC #193102 v3

to protect those trusses upon delivery to that Project. Finally, it is undisputed that the trusses in all 24 homes grew mold.

Furthermore, the evidence establishes that the trusses were installed within days of delivery, and those not installed immediately were covered and protected by Stanley Martin when Shoffner failed to do so. In addition, the houses were under roof shortly after the trusses were installed. Moreover, Stanley Martin will offer the testimony of Matthew Cooper, the only expert in this case who saw the trusses, before remediation, in all 24 homes, that based on the growth pattern of the mold and the percentage concentrations of mold, it is his opinion that the trusses were unduly moist at delivery by Shoffner and thus unduly susceptible to mold growth. This evidence is clearly sufficient to establish negligence, breach of contract and product defect under Maryland law. *Harrison v. Bill Cairns Pontiac of Marlow Heights, Inc.*, 77 Md. App. 41, 549 A.2d 385 (1988). Maryland law is equally clear: genuine disputes of material fact defeat summary judgment.

Second, Shoffner argues that Stanley Martin's negligence count fails because (i) Stanley Martin cannot produce evidence that Shoffner unreasonably handled the trusses before delivery, and (ii) Stanley Martin was contributorily negligent. Leaving aside the numerous material facts in dispute concerning the conduct of the parties and the legal significance of that conduct (as summarized above), which unequivocally defeat summary judgment, it is well settled that negligence issues, including contributory negligence, should be decided by a trier of fact and are not appropriately decided on summary judgment.

Third, Shoffner argues that Stanley Martin cannot establish its breach of contract claim. This argument is equally flawed. Shoffner argues that Stanley Martin failed to reject the trusses upon delivery. Well-settled Maryland law, however, requires a buyer to reject defective goods

DC #193102 v3

within a reasonable time of when it should have discovered the defect. Stanley Martin could not have discovered the defect upon delivery because elevated moisture content in wood is not identifiable to the human touch or the naked eye. Moreover, mold can begin to grow and not be immediately visible to the naked eye. Furthermore, under applicable caselaw, questions concerning discovery of defects and reasonable notice of such defects are pure questions of fact. Stanley Martin notified Shoffner when it learned of the scope of the homeowners' allegations, so that it could investigate. Stanley Martin also advised Shoffner of the subsequent expert conclusion that its trusses were the problem, but the parties agreed to enter into a tolling agreement given pending threats of litigation. At best, Shoffner raises a disputed question of fact which must be decided by a jury.

Shoffner's breach of contract argument also fails because the evidence establishes that Shoffner breached the contract in at least three ways. The Stanley Martin/Shoffner Contract required Shoffner to deliver trusses of high quality that exceeded industry standards. There can be no question: high quality trusses that exceed industry standards do not grow mold. Here, the trusses in all 24 homes grew mold. Consequently, a genuine dispute of fact exists as to whether Shoffner breached its contractual obligations.

The contract also required Shoffner to properly unload the trusses upon delivery and cover them to prevent moisture gain. Shoffner admits that it did not uphold this obligation, but argues—without support of caselaw—that Stanley Martin waived that obligation. The contract, however, explicitly states that Stanley Martin's failure to insist on this obligation does not relieve Shoffner from performing it or being responsible for damage arising from it. Accordingly, a genuine issue of fact exists as to whether Shoffner breached this requirement.

DC #193102 v3

Finally, Stanley Martin has paid nearly $2 million to remediate the mold in the 24 homes. Under the contract, Shoffner agreed to not only correct defects or improper workmanship in the trusses at any time, but to indemnify Stanley Martin for costs arising from or relating to Shoffner's failure to comply with its obligations, acts, omissions, negligence and/or default. Shoffner failed to correct the defects in its trusses or to pay any costs of remediating the truss mold. Under these facts, Shoffner has clearly breached the contract.

Lastly, Shoffner argues that this action is subject to a one-year limitations period for demanding arbitration. Like the others, this argument fails. Shoffner cites to a contract provision governing default terminations, simply ignoring those contract provisions which apply after the completion of the work. Of course, Stanley Martin bases its claims on provisions of the contract which apply to latent defects, repair of defective work and indemnification from third-party claims after the sale of the home. What is more, Shoffner's position is based on the absurd contention that this dispute was "known" to Stanley Martin prior to the time that the vast majority of the trusses at issue had even been delivered to the Project—hardly an undisputed material fact.

## II.  STATEMENT OF FACTS

### A.    The Quince Orchard Park Development.

Plaintiff Stanley Martin is a residential homebuilder and developer with its principal place of business in Reston, Virginia. Affidavit of Steven B. Alloy (hereinafter "Alloy Aff.") ¶ 2. (The Alloy Aff. is attached hereto as Exhibit A.) Stanley Martin has been in the residential construction business for nearly 40 years, has built thousands of homes, and has more than 10,000 residents living in its Maryland and Virginia communities. Alloy Aff. ¶ 3. Stanley Martin is the top-rated privately-owned builder in the Washington, D.C. market according to the most recent J.D. Power & Associates Customer Satisfaction Survey. Alloy Aff. ¶ 4.

DC #193102 v3

In 1999, Stanley Martin began construction on the first of 24 duplex townhomes in the Quince Orchard Park development, in Gaithersburg, Maryland. Alloy Aff. ¶ 5. Each duplex unit consists of two homes, with a gypsum board firewall forming the barrier between the two units. Alloy Aff. ¶ 6.

Consistent with its standard practices, Stanley Martin employed a superintendent to oversee the construction of the Quince Orchard Park townhomes. Alloy Aff. ¶ 7. Initially, the superintendent was Todd LeComte. *Id.*; Deposition of Andrew Pitman (hereinafter "Pitman Dep.") at 22:19-21; 23:1-2; 23:7-16. (Relevant excerpts of the Pitman Dep. are attached as Exhibit MSM-1 to the Affidavit of Michael S. McNamara (hereinafter "McNamara Aff."), which is attached hereto as Exhibit B.) Mr. LeComte supervised construction of the first duplex unit, one of which became the "model" home. *Id.* The model was completed in May 1999. Pitman Dep. at 33:1-18.

Shortly before the model was completed, Mr. LeComte was promoted within Stanley Martin and became a regional construction manager. Deposition of Steven B. Alloy (hereinafter "Alloy Dep.") at 42:6-10. (Relevant excerpts of the Alloy Dep. are attached as Exhibit MSM-2 to the McNamara Aff.) Andrew Pitman replaced Mr. LeComte as the superintendent for construction of the remaining Quince Orchard Park homes. Pitman Dep. at 23:12-24. Mr. Pitman supervised construction of the remaining 22 houses between May 1999 and early 2000. Pitman Dep. at 22:1-7.

Construction of all 24 homes occurred over the course of a year and in all four seasons. Alloy Aff. ¶ 8. The units were not constructed simultaneously and thus, each unit was constructed under different conditions—different laborers, different weather and daily conditions and, in some cases, different subcontractors. Alloy Aff. ¶ 9.

DC #193102 v3

The general construction sequence for these townhomes began with the staking out of the site. Pitman Dep. at 38:19-39:1. Once the lot was staked out, the dirt was excavated, then the foundation poured, then the framing work began, including installation of the trusses. *Id.* at 67:6-20, 123:3-7. The houses were framed floor by floor from bottom to top with first floor floor trusses being installed over the basement level, subflooring installed on top and adjacent to the first floor trusses, followed by the framing for the first floor walls, then the second floor floor trusses, subflooring and second floor walls. *Id.* at 124:12-18, 125:18-126:5. Roof trusses were then installed and sheathing and shingles applied. *Id.* at 258:4-6. Once this occurred a unit was considered "under roof." Framing of a unit from the first floor until the unit was under roof, took approximately seven to ten days. Deposition of Robert Maze (hereinafter "Maze Dep.") at 49:22-50:3. (Relevant excerpts of the Maze Dep. are attached as Exhibit MSM-3 to the McNamara Aff." Drywall was applied shortly thereafter. Pitman Dep. at 258:4-6.

### B.    The Stanley Martin/Shoffner Contract.

Stanley Martin executed purchase orders for the floor and roof trusses for the Project pursuant to a master contract entered into with Shoffner. Alloy Aff. ¶ 10 & Ex. SBA-1 (hereinafter the "Contract"). The Contract required Shoffner to supply trusses that were "free from deficiencies and defects" and that "exceed industry standards." Alloy Aff. Ex. SBA-1. Warranty/Inspections, Section (a). The Contract further required Shoffner to supply trusses that are of high quality pursuant to industry practices and to correct defects or improper workmanship at any time:

> (b)     The Vendor also warrants that for a period of one (1) year from the date of settlement between owner and first purchaser and/or fourteen (14) months from all applicable final inspections on the house or building (or on each individual house or building), that the materials supplied by the Vendor are of high quality pursuant to industry practices or procedures. . . .

DC #193102 v3

> (c)    Additionally, <u>corrections due to defects or improper workmanship may be required at any time</u>, even after the warranty expires.

*Id.*, Warranty/Inspections, Sections (b) & (c) (emphasis added).

Shoffner was further required to properly unload and store the trusses after delivery:

> The Vendor [Shoffner] shall supply all labor to properly unload and store delivered materials.  The Vendor shall properly protect all materials by placing them in secured areas, covering them with polyurethane (supplied by the General Contractor), and elevating them off ground or basement floor.  Perishable items shall not be stored outside or in locations where they would be exposed to the elements or any conditions that would affect their quality.  All materials shall be kept out of swales and right of ways.  Storage areas are to be maintained in a neat and orderly method.

Alloy Aff. Ex. SBA-1 General Conditions, Section (a).

Shoffner's obligations, however, did not cease after delivery.  Shoffner was, at all times, solely responsible for the "workmanship, warranties and condition of the materials," including "responsibility for any damage to materials improperly stored."  Alloy Aff. Ex. A, General Conditions, Section (a).  Furthermore, Shoffner agreed to hold Stanley Martin harmless and indemnify it for all failures to comply with the Contract:

> In addition, the Vendor shall hold the General Contractor harmless from any liability, claims, lawsuits, damages or costs, including attorney's fees, arising from or relating to the Vendor's failure to comply with this Contract, and/or any applicable building code.  The remedies provided in this paragraph shall be in addition to any other remedies provided by this Contract or made available by the laws of the State where the material was delivered. . . .

*Id.*, Default by Vendor/Termination Section (a).  And for any damage arising from the trusses:

> . . . from any and all liability, claims, lawsuits, damages, and/or demands arising from or relating to any act[,] omission, negligence or default of the Vendor or its subcontractors or employees including without limitation, any act, omission, negligence or default that results in or causes bodily harm or death and/or property damage.

8

*Id.*, Insurance, Section (a).

## C.   The Shoffner Trusses

Brent Holcomb, Shoffner's corporate representative, testified in deposition that the trusses were manufactured from stick lumber that was delivered to the Shoffner plant. Brent Holcomb Deposition ("Holcomb Dep.") at 28:24-29:18. (Relevant excerpts of the Holcomb Dep. are attached as Exhibit MSM-4 to the McNamara Aff.) After manufacture, the trusses were then banded together and placed in an outdoor storage yard where they sat, continuously exposed to rain and the elements:

> A:   . . . Well, once [the trusses] go through the production process they are stacked, banded together as a unit and then they are set out on the yard to await delivery.
>
> Q:   And what is the yard? That's not under a shed presumably?
>
> A:   No, it is not under a shed. . . .
>
>            *   *   *
>
> Q:   So the three plants, Fisherville, Chesapeake and New Windsor, when those trusses are assembled and stored in the yard, they are all open to the sky?
>
> A:   That's correct.

Holcomb Dep. at 48:9-49:2.

The trusses remained banded in the yard, without covering or protection, until an order was placed for delivery:

> Q:   When the trusses are placed in the yard after manufacture, are they covered in any way?
>
> A:   No.
>
> Q:   So there's no tarp placed over them or anything?
>
> A:   No.

Holcomb Dep. 50:22-51:1.

Mr. Holcomb testified that there were no records indicating how long those trusses remained in the yard:

DC #193102 v3

> Q:   And if you don't have the records that you were describing a moment ago, there's no other record that will show how long the trusses were kept in the yard?
>
> A:   No.

Holcomb Dep. at 51:2-6.

The trusses were then delivered to Stanley Martin in open-air flatbed trucks, again without protective covering:

> Q:   Are any of those trucks enclosed?  Do they have a roof?
> A:   No.
> Q:   So all of them are open to the sky during—
> A:   That's correct, right.
> Q:   —delivery?
> A:   Right.
> Q:   Are they covered during that trip?
> A:   No.

Holcomb Dep. at 52:19-53:2.

It is well settled that mold grows in wood with 20% or higher moisture content.

Deposition of Matthew Cooper (hereinafter "Cooper Dep.") at 74:19-75:4.  (Relevant excerpts from the Cooper Dep. are attached as Exhibit MSM-5 to the McNamara Aff.)  It is also settled in the industry that wood building materials should not have a moisture content which allows mold to grow.  Mr. Holcomb, however, testified that Shoffner did not moisture test the lumber from which the trusses were manufactured:

> Q:   . . . Did [Shoffner employees] test wood that doesn't appear wet with a moisture meter?
> A:   Yes, they could.
> Q:   But are they required to?
> A:   They are not required to.
> Q:   When you say they could, is that typically done?
> A:   If there's some reason to believe there's a problem, then it would be done, yeah.
> Q:   Okay, but it is not done to every load?
> A:   No, no.

Holcomb Dep. at 32:10-19.

Nor did Shoffner ever moisture test the trusses after manufacture and prior to delivery:

Q:     Okay.  But what I'm talking about is later on in the process, during—I mean there's no testing during or after the trusses are manufactured?

A:     No.

Q:     And when they are put in or even after they are put into storage, after delivery?

A:     The trusses in storage?

Q:     I am sorry, I misspoke.  The lumber, when the lumber gets put into storage after delivery?

A:     Not as a normal course of business we do not test it after that, right.

Q:     And not after construction, after the truss is manufactured?

A:     That's correct.

Q:     And not after the truss is put in the yard for storage, post construction but predelivery [to the customer]?

A:     That's correct.

Q:     And it is not tested for moisture when it is loaded onto the trucks?

A:     That's correct.

Q:     And it is not tested for moisture when it is delivered to the customer?

A:     That's correct.

Q:     <u>So the normal course is at no point after initial delivery from a Shoffner supplier is wood tested for moisture?</u>

A:     <u>That's essentially correct.</u>

Holcomb Dep. at 34:7-35:8 (emphasis added).

Not only did Shoffner never moisture test its trusses, Shoffner failed to give its

employees any mold-related training:

Q:     . . . But no, no training about the circumstances under which mold grows?

A:     Not formally, no.

Q:     Shoffner doesn't give its employees any training regarding different types of mold?

A:     Not formally.

Q:     And Shoffner doesn't give its employees any training regarding the effects on human health of different types of mold then?

A:     No.

Holcomb Dep. at 36:10-19.  And, Shoffner employees conducted no testing to determine whether

the raw lumber contained mold:

Q:     . . . When you see something that you think is mold, how do you find [out] whether it is actually mold?

A:     How do we find out if it is actually mold.  Well, we don't have any, you know, any type of chemical process to go through.  I mean, it is just a

DC #193102 v3

> visual inspection.  We sort of know the difference between blue stain and
> different colors of mold. . . .

Holcomb Dep. At 37:2-9.  Furthermore, Shoffner has no written policies directing its employees

to moisture test wood or identify and eradicate mold or advising them that they needed to ensure

that mold was not present on the trusses prior to delivery.  Holcomb Dep. at 39:1-6; 41:12-18.

Once the trusses were delivered to the Project, Stanley Martin had them placed on blocks

to keep them off the ground and, if not immediately installed, covered the trusses.  Pitman Dep.

at 151:13-19; 152:11-15; 154:7-155:8.  Trusses were installed beginning immediately after

delivery and generally were completely installed within one to two days.  Pitman Dep. at 159:12-

19.  Units were generally under roof within a few days after installation of the trusses.  Maze

Dep. at 49:22-50:3.

### D.   Homeowners Discover Mold.

The first buyers moved into Quince Orchard Park in mid-1999, while other units were

still under construction.  Alloy Aff. ¶ 11.  In late-1999, one homeowner, Elizabeth Gensler,

informed Stanley Martin that she saw mold on the exposed area of trusses in her basement.

Alloy Aff. ¶ 12.  Stanley Martin promptly investigated this situation and had the mold bleach

cleaned.  Alloy Aff. ¶ 12.

Mrs. Gensler then identified more mold on the exposed trusses and began discussing her

concerns with other homeowners.  Other homeowners soon began reporting mold on the exposed

sections of the trusses in their homes.  As a result, Stanley Martin retained Mantech

Environmental to investigate the mold reports, and to take air and surface samples from certain

homes.  Alloy Aff. ¶¶ 13 &14.

During this time, certain homeowners began complaining to the City of Gaithersburg (the

"City").  Alloy Aff. ¶ 15; Cooper Dep.  The City, independent of Stanley Martin, engaged

Patuxent Environmental Group, Inc. ("Patuxent") and its principal, Matthew Cooper, to also investigate the mold complaints. Cooper Dep. at 9:8-17; 10:2-9; 11:6-21; 12:1-3. Mr. Cooper is a Certified Indoor Environmentalist who has worked in the field of indoor air quality for more than 10 years. *Id.* at 5:4-7; 5:14-6:21. He is familiar with the biology of mold, how it grows and what it needs to grow. *Id.* at 8:7-12. He is also familiar with industry standards and guidelines for effective mold remediation. *Id.* at 22:3-9.

The City initially asked Mr. Cooper to inspect three of the homes and to review Mantech's work, including its testing protocols and investigative conclusions. Cooper Dep. at 14:14-20; 24:6-9; 27:12-15; 28:10-13; Declaration of Matthew Cooper (hereinafter "Cooper Decl.") ¶¶ 2-3. (The Cooper Decl. is attached hereto as Exhibit B.) By late-2000, because of the growing number of homeowner complaints and the results of the prior testing that was performed, Stanley Martin decided to conduct a more thorough investigation on each of the 24 homes. In January 2001, Stanley Martin directly retained Cooper and Patuxent to perform this investigation, which included the removal of drywall in ceilings for a complete inspection of all interstitial spaces. Alloy Aff. ¶ 16; Cooper Decl. ¶ 4. Equipment was also extended into ceiling cavities to assess the mold in locations where drywall was not totally removed. Cooper Dep. at 39:10-21; 40:6-14; 41:9-13; Cooper Decl. ¶ 4. These investigations occurred into the Spring of 2001.

After the investigations were performed, Patuxent helped generate protocols for the effective remediation of the mold in each home. Cooper Dep. at 27:12-15; Cooper Decl. ¶ 5. Stanley Martin then employed Popowski Brothers to perform the remediation pursuant to those protocols and Patuxent to oversee the remediation. *Id.;* Cooper Dep. at 29:20-30:17; 31:18-32:8.

DC #193102 v3

E.    **The Shoffner-supplied trusses were delivered with elevated moisture levels, and were therefore unduly susceptible to mold growth.**

Although the City, and subsequently Stanley Martin, retained Mr. Cooper to investigate the mold at Quince Orchard Park at the time of the complaints, Mr. Cooper is also an expert regarding the sources of mold growth and the sufficiency of mold remediation methods. Cooper Decl. ¶ 6. Specifically, Cooper testified that mold spores are ubiquitous and not visible to the naked eye. Cooper Dep. at 102:20-103:4; Cooper Decl. ¶ 20. In order to grow, mold spores from the air need a food source, moisture, and an agreeable temperature. Cooper Decl. ¶¶ 19, 20. Here the truss wood served as the food source for the mold and the temperatures on the East Coast support growth. *Id.* The question then, is moisture.

Mr. Cooper was the only expert who saw the mold covered trusses in all 24 homes before remediation. Cooper Dep. at 75:13-14. He is one of the few individuals who can accurately testify as to their pre-remediation condition and to the condition of the other building materials in each of the 24 homes. *Id.* Mr. Cooper states, based on these visual inspections, that there was mold on the floor trusses in all 24 homes—on both the first and second floors. Cooper Dep. at 128:3-18. There was not one home without truss mold. *Id.* Significantly, despite the fact that the trusses were mold covered, there was no mold contamination of any adjacent or abutting wood building materials. Cooper Dep. at 72:13-17; 73:2-10. For example, subflooring that sat directly atop the floor trusses and other wood framing members which abutted mold covered trusses contained no mold. *Id.*

Mr. Cooper also notes that the truss mold predominated certain areas of the trusses, for example, in the corners, on sides, and near the gusset plates. These mold patterns were consistent from one truss to another and from one house to another. *Id.* at 71:21-72:5.

14

Mr. Cooper also considered potential moisture sources.  Mr. Cooper found that there were no signs of water intrusion (systemic or otherwise) in each of the 24 homes that would have or could have caused the trusses to grow mold.  Cooper Decl. ¶ 12.  Specifically, he determined that moisture caused by isolated problems such as leaky faucets, toilets, and foundations, and poorly insulated drain pipes, could not have caused the truss mold.  Cooper Decl. ¶ 11.  Cooper Decl. ¶ 16.

Two things ruled out moisture introduction during construction.  Cooper Decl. ¶ 17.  First, the 24 homes were built during different times of year, under different weather conditions, and with different amounts of rainfall, yet all 24 homes had mold on the trusses, and not on the other wood-based construction materials, like subflooring.  *Id.*; Cooper Dep. at 128:3-12.  Second, the growth patterns on the trusses were inconsistent with rainwater falling on them during construction.  Cooper Decl. ¶ 18.  Rain introduction typically occurs from top to bottom and would have affected higher exposed materials to a greater extent than lower exposed materials.  *Id.*  But the mold growth patterns were unique to the pieces of lumber themselves.  Cooper Decl. ¶ 18.  Accordingly, the growth patterns rule out the possibility that the trusses became moist after delivery.  *Id.*

Consequently, based upon his training as a Certified Indoor Environmentalist and his experience in mold and moisture investigations, his visual observations of the trusses, the witnessed growth pattern of the truss mold, the fact that there was no water source sufficient to wet all of the trusses in one house let alone in each of the 24 homes (top to bottom), and the fact that adjacent wood building materials contained no mold growth, Mr. Cooper determined that the trusses were inherently moist and unduly susceptible to mold growth at the time of delivery:

> Q:    During the inspection, during these demolition inspections of these houses, at this phase when you did—while you were doing all of them,

Q: taking it collectively, did you develop an opinion as to the water source that caused the mold growth on the trusses?

A: Yes.

Q: And what was your opinion?

A: Our opinion was that the moisture that supported mold growth on the trusses would have most likely been inherent inside the trusses as no other wood components in the same area exhibited signs of visible suspect mold growth.

Cooper Dep. at 71:4-72-5; Cooper Decl. ¶¶ 10, 19, 20.  But for elevated moisture levels inherent in the trusses, the mold growth would not have occurred.  Cooper Decl. ¶¶ 15, 17, 19.

F. **Remediation.**

After certain homeowners began to complain about mold on the exposed trusses in their homes Stanley Martin notified Shoffner and advised Shoffner of Stanley Martin's intent to investigate.  Alloy Aff. ¶¶ 18, 19.  While representatives of Shoffner visited the site, it did not play a role in the investigation.

After the destructive testing and investigation was completed, in mid-2001, Mr. Cooper advised Stanley Martin that the trusses were the source of the mold and needed to be remediated. Cooper Dep. at 71:4-16.  Patuxent helped design remediation protocols for each individual home, based upon Patuxent's own investigation and the results of the Mantech surface and air samples and the laboratory results from those samples.  Cooper Decl. ¶ 6.  The protocols were designed to conform to the New York City Remediation Guidelines (the "NY Guidelines").  Cooper Decl. ¶ 25.  At the time, no national standard for mold remediation existed, and the NY Guidelines were the only accepted standard that existed.  *Id.*  Significantly, the NY Guidelines are still among the most recognized standards for mold remediation today, even being adopted in large part by the United States Environmental Protection Agency ("EPA").  *Id.*  Each homeowner agreed in writing to the implementation of the remediation protocols.  Cooper Decl. ¶ 26.  Remediation of

DC #193102 v3

the houses began in Spring 2001. Shoffner did not participate in the remediation. Cooper Decl.

¶ 27; Alloy Aff. ¶ 23.

### G.   Homeowners sue.

In spite of Stanley Martin's efforts to investigate the source of moisture and mold and to

design and implement remediation protocols, 14 of the 24 homeowners filed suit against Stanley

Martin and Shoffner in early 2002. Alloy Aff. ¶ 23. Although the homeowners had no contract

with Shoffner, they sued Shoffner for product defect. Alloy Aff. ¶ 24. They did not sue any

other subcontractor or supplier. *Id.* Thirteen of the homeowners sought $10 million each in

damages. Alloy Aff. ¶ 25. The fourteenth, Randi Cohen, claimed $20 million in damages. *Id.*

### H.   Stanley Martin and Shoffner entered into a Tolling Agreement.

Once Stanley Martin became aware that the Shoffner trusses were the cause of the mold,

Stanley Martin notified Shoffner and demanded its participation in and indemnification for truss

mold remediation. Shoffner did not participate in the remediation, however, Shoffner did meet

with Stanley Martin representatives to discuss approaches to the clean-up and, after the lawsuits,

joint defense strategies. Alloy Aff. ¶ 26. Stanley Martin and Shoffner agreed that they would be

able to defend the homeowner claims more effectively if Stanley Martin did not file a cross-

claim against Shoffner, or file separate litigation against Shoffner. Alloy Aff. ¶ 27.

Accordingly, Stanley Martin and Shoffner agreed to table the dispute between the two of them as

to responsibility for the truss mold. Alloy Aff. ¶ 28. The parties entered into a "Tolling

Agreement," which by its terms, suspended all applicable limitations periods, so that the parties

could jointly defend against the homeowner claims. McNamara Aff. Ex. MSM-6.

Stanley Martin completed the remediation program in late-2003 at a cost of nearly $2

million. Alloy Aff. ¶ 29. The two most significant components to this cost were the remediation

contractor, Popowski Brothers, and the cost of relocating certain homeowners, which was

necessitated by the requirement that the HVAC systems be turned off during the truss remediation.  Alloy Aff. ¶ 30; Cooper Decl. ¶ 28.

After Stanley Martin completed the remediation process, which each of the homeowners had agreed to, the homeowners no longer had any basis for their claims.  Alloy Aff. ¶ 29. Without an argument that the moldy conditions still existed, the 14 homeowners who had sued, settled their lawsuits for nuisance value.  Alloy Aff. ¶ 29.  The remaining 10 homeowners never filed suit.

> I.     **Shoffner has experienced moldy trusses on other projects, but refused to answer interrogatories asking for this information.**

In discovery, Stanley Martin tried to learn whether any other Shoffner customer had ever complained of moldy trusses prior to or after this event, but Shoffner refused to answer the interrogatory.  Ex. D.  Mathew Cooper, however, investigated another instance of mold growing on trusses on a project unrelated to Stanley Martin, which involved Shoffner supplied trusses. *Id.* Specifically, trusses supplied by Shoffner were delivered with mold.  Cooper Decl. ¶ 29.

> J.     **Stanley Martin filed this lawsuit against Shoffner to recover the remediation costs.**

Stanley Martin filed this lawsuit seeking to recover the costs of remediating the mold on the Shoffner trusses.  Stanley Martin asserts five causes of action against Shoffner: (1) Breach of Contract; (2) Negligence; (3) Contractual Indemnity; (4) Common Law Indemnity; and (5) Contribution.  Shoffner has moved for summary judgment on just the first two causes of action.

## III.  SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure establishes that "[t]he judgment sought shall be rendered forthwith if . . . there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

18

The movant's motion for summary judgment should only be granted if the movant has demonstrated there is no genuine dispute of any material fact. A dispute over a material fact is "genuine" if any reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Further, a fact is material if it may affect the outcome of the case. *See Anderson*, 477 U.S. at 248; *Fusco v. G.E. Gov't Servs., Inc.*, 897 F. Supp. 926, 927 (D. Md. 1995).

Summary judgment may not be granted if material facts *or* inferences fairly deducible from those facts are in genuine dispute. *Tucker v. KFC Nat'l Mgmt. Co.*, 689 F. Supp. 560, 561 (D. Md. 1988). The requisite evidentiary threshold for a case to proceed to trial is only that there be sufficient evidence supporting the genuine dispute to require a judge or jury to resolve it; not that the issue will be resolved in the nonmoving party's favor. *See Anderson*, 477 U.S. at 248-49 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). Moreover, all evidence and inferences must be viewed in the light most favorable to the nonmoving party. *See Anderson*, 477 U.S. at 255; *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985); *Lee v. Baxter Healthcare Corp.*, 721 F. Supp. 89, 92 (D. Md. 1989); *Federal Sav. & Loan Ins. Corp. v. Williams*, 599 F. Supp. 1184, 1192 (D. Md. 1984). Thus, the trial court should proceed with caution and only grant summary judgment "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson,* 477 U.S. at 250 (citing *Brady v. Southern Ry. Co.*, 320 U.S. 476, 479-80 (1943)).

Here, nearly every material fact at issue is disputed. Indeed, Shoffner impliedly concedes that in its motion by not providing a statement of undisputed facts or even acknowledging that such facts exist that would entitle it to judgment as a matter of law. Consequently, under well-

settled case law, the issues must be decided by the trier of fact and Shoffner's motion must be denied.

## IV. ARGUMENT

**A.     Significant genuine issues of material fact exist concerning Stanley Martin's breach of contract and negligence counts precluding summary judgment.**

Pursuant to its Contract with Stanley Martin, Shoffner was required to supply "high quality" wood trusses, "free from deficiencies and defects" that "exceed industry standards". Alloy Aff. Ex. A, Warranty/Inspections Sections (a) and (b).  The Contract further required Shoffner to "properly unload and store" and "properly protect" the trusses at delivery.  Alloy Aff. Ex. A, General Conditions, Section (a).  The Contract further required Shoffner to correct any "defects or improper workmanship" with the trusses "at any time" and holds Shoffner solely responsible for the workmanship warranties and condition of the materials.  Alloy Aff. Ex. A, General Conditions Section (a) and Warranty/Inspections Section (c).  Shoffner is further contractually responsible for "any damage to materials improperly stored".  Alloy Aff. Ex. A, General Conditions Section (a).  Finally, the Contract contains two indemnity provisions which require Shoffner to indemnify Stanley Martin from any and all damages arising from or relating to any failure to comply with the Contract and its acts, omissions, negligence and default.  Alloy Aff. Ex. A, Default by Vendor/Terminations, Section (a) and Insurance, Section (a).

**1.     Stanley Martin's evidence establishes that Shoffner's trusses were unduly susceptible to mold growth when Shoffner delivered them.**

The evidence establishes that Shoffner's trusses were unduly susceptible to mold growth upon delivery thus violating its contractual requirements to provide trusses of high quality, that are free from defects and deficiencies and exceed industry standards.  Stanley Martin is entitled to have that evidence heard and decided by a jury.  Specifically, the evidence will show that:

- All 24 homes had mold growing on the trusses on both the first and second floors.

- No adjacent or abutting wood building materials in each of the homes contained mold growth.
- There was no evidence of any water intrusion into the homes that would have caused the trusses to become wet thereby allowing mold to grow, let alone any event that could have effected the first and second floors of <u>all</u> 24 homes.
- The homes were built at different times, under different conditions by different Project personnel over a period of a year, yet each home had mold on the trusses.
- The houses were constructed in a matter of months with no delay.
- Shoffner never moisture tested the trusses at any time prior to delivery.
- Shoffner sat trusses outside in the yard awaiting delivery.
- Shoffner delivered the trusses in open air trucks.
- Shoffner never protected the trusses.
- The concentrations of individual mold species found on the trusses were not what Mr. Cooper would expect to find if the mold growth originated after delivery.

In addition, Matt Cooper, the only expert identified in this case who witnessed and has personal knowledge concerning the extent of the mold growth in all 24 homes, testifies that the mold grew due to excess moisture present on the trusses at delivery based on the growth patterns and concentrations of the mold.

This evidence is not only sufficient to defeat summary judgment, but is more than sufficient for a jury to find that the trusses were inherently defective and unduly susceptible to mold growth, thereby establishing that Shoffner was negligent and breached its contract.

Shoffner wrongly suggests that Stanley Martin must offer "direct" evidence that the trusses were defective when they were delivered to satisfy its burden of proof. This is simply not true. As the court in *Reed v. Sears, Roebuck & Co.*, 934 F. Supp. 713 (D. Md. 1996), explained, the plaintiff's burden in a product defect case need not be based upon direct evidence:

> Plaintiffs need not "negative [sic] entirely the possibility that [defendant's] conduct was not a cause, and it is enough that [they] introduce[] evidence from which reasonable [jurors] may conclude that it is more probable that the event was caused by [the defendant] than that it was not."

DC #193102 v3

*Id.* at 720 (quoting *Otis Elevator v. LePore*, 229 Md. 52, 58, 181 A.2d 659, 662 (1962)).  Indeed,

it is well settled that circumstantial evidence is sufficient to establish a product defect.  *Harrison*

*v. Bill Cairns Pontiac of Marlow Heights, Inc.*, 77 Md. App. 41, 549 A.2d 385 (1988).

The *Harrison* court identified five factors for courts to consider when determining

whether a product defect can be inferred from circumstantial evidence: "(1) expert testimony as

to possible causes; (2) the occurrence of the accident a short time after the sale; (3) same

accidents in similar products; (4) the elimination of other causes of the accident; (5) the type of

accident that does not happen without a defect." 77 Md. App. at 51, 549 A.2d at 390 (quoting

*Cornell Drilling Co. v. Ford Motor Co.*, 359 A.2d 822, 827 (Pa. Super. Ct. 1976)).  Applying the

evidence here to the five *Harrison* factors, and viewing that evidence in the light most favorable

to Stanley Martin, it is beyond dispute that Stanley Martin's evidence is sufficient to defeat

summary judgment.

     i.     **Expert testimony as to possible causes**

Contrary to Shoffner's argument that Stanley Martin must use expert testimony to

establish a defect, Maryland courts have ruled that this is not necessary.  Specifically, in *Virgil v.*

*"Kash N' Karry" Service Corp.*, 61 Md. App. 23, 484 A.2d 682 (1984), a case relied on by

Shoffner, the Maryland Court of Special Appeals explained,

> We reject the appellees' contention that it was necessary for the
> appellants to produce expert testimony to establish the existence of
> a defect.  The general rule is well established that expert testimony
> is only required when the subject of the inference is so particularly
> related to some science or profession that it is beyond the ken of
> the average layman.  Expert testimony is hardly necessary to
> establish that a thermos bottle that explodes or implodes when
> coffee and milk are poured into it is defective.  When a product
> fails to meet the reasonable expectations of the user, "the inference
> is that there was some sort of a defect, a precise definition of which
> is unnecessary."

61 Md. App. at 31, 484 A.2d at 656 (quoting *Heaton v. Ford Motor Co.*, 435 P.2d 806, 808 (Or. 1967)). Like *Virgil*, expert testimony is hardly necessary to establish that wood trusses in 24 homes that all sustained mold growth are defective.

While expert testimony as to <u>actual</u> cause is not necessary, *Harrison* identifies expert testimony as to possible causes as a relevant factor. Mr. Cooper's testimony does that, and much more. Indeed he not only establishes that elevated moisture content in the trusses prior to delivery is a <u>possible</u> cause of mold growth or the "accident", he testifies that this is <u>the</u> cause. Thus, the expert testimony goes beyond the *Harrison* requirement—and fixes the <u>actual</u> cause of mold growth: moisture in the trusses at delivery.

### ii.    Mold began to grow a short time after the sale

Under well-established caselaw construing the *Harrison* factors, the question of whether to draw an inference that the time period indicates a product defect is well within the province of the jury. *Watson v. Sunbeam Corp.*, 816 F. Supp. 384, 388 (D. Md. 1993). Here, the trusses were installed within days after they were delivered, and were then covered with other building materials such as subflooring and drywall, hiding them from view. Nonetheless, one of the homeowners discovered mold on her trusses in late-1999 and other homeowners began discovering mold on trusses during 2000. No other sources of moisture in all 24 homes have been identified, and once the trusses themselves were remediated the problems never reappeared. The sequence and timing of the relevant events strongly supports Stanley Martin's allegations.

### iii.    Same accidents in similar products

Under *Harrison*, where there are similar "accidents" in similar products, a product defect may be inferred. For example, in *Watson*, the defendant manufactured more than 6,000 electric blankets, the product that the plaintiff alleged was defective. 816 F. Supp. at 388. Of those, the manufacturer had received only one other complaint, and there was no evidence about that other

23

complaint. *Id.* Under those circumstances, the *Watson* court found this factor "neutral;" it did not favor either the plaintiff or the defendant. 816 F. Supp. at 389.

Here, in contrast, the only evidence before the Court shows that 100% of the homes built with Shoffner-supplied trusses have experienced mold growth on those trusses. The Project consisted of 24 separate homes. The homes were not constructed simultaneously, and they were not constructed with a single delivery of wood from Shoffner. Yet all 24 homes experienced the same accident: Mold on trusses. There was no exception.

Furthermore, in discovery, Stanley Martin tried to learn whether Shoffner had ever experienced mold on trusses in other circumstances. Shoffner refused to answer the question. Mathew Cooper, however, investigated mold growth on trusses on another project, unrelated to Stanley Martin, in Delaware. During the course of that investigation, Mr. Cooper discovered that trusses supplied by Shoffner were delivered with mold on them. Cooper Decl. ¶ 29.

### iv.    Elimination of other causes of the accident

The facts here are similar to *Watson v. Sunbeam* for purposes of the fourth *Harrison* factor as well. In *Watson*, the accident occurred when an electric blanket caught fire. The defendants tried to show that the plaintiffs could not eliminate other causes of the accident by identifying two potential causes for which the plaintiffs would have been responsible: crossed wires and children playing with matches. 816 F. Supp. at 388. The plaintiffs disputed both of these with testimony that the wires were not crossed, and the children did not play with matches on the night of the fire. *Id.* at 388-89. Since the issue was before the *Watson* court on summary judgment—as it is here—the *Watson* court concluded that genuine disputes of fact existed. *Id.* Importantly, since there were issues of fact, the *Watson* court concluded that the factor favored the plaintiffs. *Id.*

24

The facts here compel the same conclusion. Shoffner does not dispute that wood must have greater than 19% moisture content to support mold growth, or that all other requirements for mold growth are ubiquitous on wood. Shoffner tries to make the same argument the manufacturer in *Watson* made: something other than the defect caused the accident. Specifically, Shoffner implies—without proof—that other moisture sources were added after delivery. Shoffner, however, does not—nor can it—offer evidence that Stanley Martin allowed any of the trusses in any one of the 24 homes to become wet—much less the trusses in all 24 homes. Rather, the only evidence before the Court establishes that Stanley Martin acted reasonably in its construction of the houses and installation of the trusses, and covered the trusses when delivered. This is all that is required.

Shoffner would like to use testimony from certain homeowners to suggest that Stanley Martin allowed the trusses to become wet and, as such, Stanley Martin is at fault. This argument fails for two reasons. First, the testimony is inadmissible as described in Stanley Martin's Motion to Strike. Second, even if admissible, Shoffner's evidence consists only of deposition testimony from three homeowners who testify about three isolated water events. Thus, this is evidence of water in only three separate homes, not 24. And more significantly it is only evidence of water, not water on the trusses. None of Shoffner's "evidence" links any water intrusion event to mold growth on trusses or mold growth on trusses in all 24 homes. Without that link, the evidence is irrelevant.

> v.    **The type of accident does not happen without a defect**

As with the "elimination of other causes" factor, Shoffner does not dispute that wood must have over 19% moisture content to support mold growth. Since the "accident" here is mold growth, it is axiomatic that mold growth does not occur without excess moisture. Accordingly, this type of accident does not occur without a defect.

DC #193102 v3

vi.    **Summary**

Courts applying the *Harrison* factors have concluded that as few as three factors favoring the plaintiff is enough to defeat a summary judgment motion. *Watson,* 816 F. Supp. at 389. Here, all five *Harrison* factors favor Stanley Martin. Consequently, the Court must deny Shoffner's Motion for Summary Judgment.

2.    **None of Shoffner's authorities change this result.**

Significantly, cases relied on by Shoffner support Stanley Martin's position. For example, in *Virgil v. "Kash N' Karry" Service Corp.,* 61 Md. App. 23, 484 A.2d 652 (1984), plaintiff sued the seller and manufacturer of a thermos which imploded, spraying hot coffee on the plaintiff, causing personal injuries. 61 Md. App. at 27, 484 A.2d at 654. At trial, the plaintiff produced no evidence scientifically explaining the implosion. 61 Md. App. at 27, 484 A.2d at 654. The trial court granted a directed verdict in favor of the defendants at the close of plaintiff's case. 61 Md. App. at 28, 484 A.2d at 654.

In reversing the lower court ruling, the Court of Special Appeals noted that, "[w]hen a product fails to meet the reasonable expectations of the user, 'the inference is that there was some sort of a defect, a precise definition of which is unnecessary.'" 61 Md. App. at 31, 484 A.2d at 656 (quoting *Heaton,* 435 P.2d at 808). The court also explained that circumstantial—as distinct from direct—evidence can support a product defect claim; "[a]n inference of a defect may be drawn from the happening of an accident where circumstantial evidence tends to eliminate other causes, such as product misuse or alteration." 61 Md. App. at 32, 484 A.2d at 657. The court explained that:

> It would seem to be axiomatic that the defect that caused the
> implosion either existed at the time Mrs. Virgil bought the thermos
> or was created thereafter. Mrs. Virgil's testimony, if believed by
> the trier of fact, tended to eliminate any likelihood that the defect
> that caused the implosion was created after Mrs. Virgil purchased

DC #193102 v3

the thermos. Consequently, her testimony gave rise to a reasonable inference that the thermos was defective when she acquired it.

61 Md. App. at 33, 484 A.2d at 657.

Here, like the *Virgil* case, the Shoffner-supplied trusses failed to meet the reasonable expectations of the user. Stanley Martin purchased wood trusses expecting that the trusses which are knowingly used in outdoor residential construction would not be unduly moist or able to support mold growth. The trusses in all 24 homes, however, grew mold. There is no evidence that Stanley Martin did anything to the trusses in any one home, let alone in all 24 homes which permitted the moisture gain. Thus, like the *Virgil* case, these facts give rise to the reasonable inference that the trusses were unduly susceptible to mold growth when they were delivered.

Shoffner also relies on *Jensen v. American Motors Corp.*, 50 Md. App. 226, 232, 437 A.2d 242, 245 (1981), for the proposition that proof of product defect must rise above surmise, conjecture or speculation. Shoffner Brief at pp. 6-7. Here Stanley Martin's proof is well in excess of surmise and conjecture. Moreover, the *Virgil* court distinguished *Jensen* because, "[i]n *Jensen*, the plaintiffs failed to present evidence that . . . the product had been neither altered nor misused." 61 Md. App. at 32-33, 481 A.2d at 657. Here, Stanley Martin presents ample evidence that the Shoffner-supplied trusses were neither altered nor misused after Shoffner delivered them.

### 3. Dr. Elliott Horner, Stanley Martin's expert, can withstand a *Daubert* challenge.

Shoffner argues that the Court should exclude the testimony of Dr. Elliott Horner, Stanley Martin's retained expert. Shoffner did not file a *Daubert* motion to exclude Dr. Horner's testimony, but instead improperly includes this argument in its brief. Nonetheless, for purposes of this opposition brief, Stanley Martin relies on the testimony of Matthew Cooper. Dr. Horner,

however, supports Mr. Cooper's testimony and analysis.  Moreover, even if Shoffner had filed a

*Daubert* motion, Dr. Horner's qualifications and analysis would withstand it.

**B.      The evidence establishes that Shoffner's negligence caused the mold growth on the trusses.**

As demonstrated above, Stanley Martin offers ample evidence to establish that Shoffner's

negligence caused the mold growth on the trusses.  Thus, there is clearly a genuine dispute of

fact regarding Shoffner's negligence.  Furthermore, Maryland courts discourage summary

judgment on negligence counts.  Indeed, only in the rarest of circumstances should a negligence

claim be taken from the jury:

> Maryland has adopted a very restrictive rule about taking cases
> from the jury in negligence actions.  *Banks v. Iron Hustler Corp.*,
> 59 Md. App. 408, 475 A.2d 1243 (1984).  Over twenty years ago,
> the Court of Appeals in *Fowler v. Smith*, 240 Md. 240, 246, 213
> A.2d 549, 554 (1965), said:
>
> ". . . Maryland has gone almost as far as any [other] jurisdiction
> that we know in holding that meager evidence of negligence is
> sufficient to carry the case to the jury.  The rule has been stated as
> requiring submission if there be any evidence, however slight,
> <u>legally sufficient</u> as tending to prove negligence, and the weight
> and value of such evidence will be left to the jury."

*Campbell v. Montgomery County Bd. of Educ.*, 73 Md. App. 54, 62-63, 533 A.2d 9, 13-14 (1987)

(emphasis added by *Fowler* court).

Despite this standard, Shoffner argues that Stanley Martin has no evidence of

unreasonable care by Shoffner.  Nothing could be further from the truth.  As discussed above,

Maryland courts have articulated five factors to use in determining the existence of a product

defect and Stanley Martin's evidence passes this test.  This alone establishes Shoffner's liability.

Stanley Martin also presents direct evidence of Shoffner's negligence and its failure to

take reasonable precautions to prevent the trusses from gaining moisture.  Shoffner's corporate

representative testified that Shoffner never tested the wood it purchased, or the product it

manufactured. Shoffner then left the trusses exposed to the elements, continuously from the time they were manufactured until they were delivered. Specifically, once the trusses were manufactured, "they are stacked, banded together as a unit and then they are set out on the yard to await delivery." Holcomb Dep. at 48:9-12. The trusses are not covered. *Id.* at 50:22-51:1. They are then shipped uncovered on open trucks. Holcomb Dep. at 52:19-25. Shoffner never moisture tested the raw lumber that it used to manufacture the trusses. Holcomb Dep. at 32:9-19. Shoffner never moisture tested the trusses after manufacture. Holcomb Dep. at 34:7-20. Shoffner never moisture tested trusses upon delivery and after being exposed to the elements. Holcomb Dep. at 34:21-35:8. Shoffner never distributed written policies directing its employees to look for excess moisture or mold on the trusses before delivery, and cannot produce any evidence that any Shoffner employee ever did so. Holcomb Dep. at 35:5-22. Finally, Shoffner has had problems with mold covered trusses delivered to other projects. Cooper Decl. ¶ 29.

Since Shoffner does not dispute that it had a duty to deliver trusses free from deficiencies and defects, including mold and undue susceptibility to mold growth, this evidence—viewed in the light most favorable to Stanley Martin—clearly establishes negligence and, as such, summary judgment must be denied.

The Court should also reject Shoffner's argument that contributory negligence bars Stanley Martin's negligence claim. Shoffner Brief, pp. 15-22. This argument fails at the outset because Shoffner bears the burden of proof on this issue and does not offer a scintilla of admissible evidence that Stanley Martin was negligent or allowed water to be introduced into all 24 of these homes sufficient to support mold growth on the trusses on all levels. *Faith v. Keefer*, 127 Md. App. 706, 746, 736 A.2d 422, 444 (1999).

DC #193102 v3

Shoffner tries to carry its burden with inadmissible evidence. Stanley Martin has filed a separate motion to strike this evidence. If the Court grants the motion to strike, the only evidence to support Shoffner's claim of contributory negligence is the deposition testimony of Andrew Pitman, Stanley Martin's superintendent for 22 of the 24 homes.

Mr. Pitman's testimony, however, does not establish any contributory negligence on Stanley Martin's part. Shoffner asks this Court to infer negligence by arguing that Mr. Pitman was not trained in waterproofing techniques regarding the structures' foundations. Not only is this inaccurate, but this testimony is a red herring. First, Mr. Pitman never testified that he had no training. To the contrary, Mr. Pitman testified that he had 22 years of experience in the construction industry and had significant on-the-job training in all facets of construction during his career. Pitman Dep. at 13:7-29; 88:14-21; 112:19-113:7. Second, Shoffner offers no evidence to show that the waterproofing on the foundation drains was inadequate. Finally, Shoffner offers no evidence to show that Mr. Pitman's waterproofing caused the trusses to become excessively moist and susceptible to mold growth in all 24 homes. Nor can they—particularly since Mr. Pitman did not participate in the construction of the first two of the 24 homes. Pitman Dep. at 22:19-23:2. Shoffner fails to cite any testimony that the trusses actually became wet after delivery or that Stanley Martin's conduct caused the trusses in all 24 homes to become wet. Viewing these facts in the light most favorable to Stanley Martin, Shoffner's claim of contributory negligence must be rejected.

This result would not change even if the Court does not strike the testimony of three of the 24 homeowners. Specifically, Shoffner only offers vague and unspecified testimony that it rained during construction, and that there was standing water during construction. Even if this testimony is admissible, however, it is irrelevant. Shoffner cites Elizabeth Gensler's deposition

testimony that there was "lots of rain" during construction, but Shoffner omitted Mrs. Gensler's testimony that she could not even remember whether her home was under roof or not during the rain. Defendant's Exhibit C, 173:10-14. Mrs. Gensler does not testify whether it rained before the house was "dried in".

Shoffner also cites the deposition testimony of Dana West for the proposition that it rained two to three times a week during a one month period. Shoffner Brief at p. 9, Defendant's Exhibit D. But Mr. West never testified that the trusses used to construct his home were exposed to the elements during this one month period.

Shoffner also attaches "weather records" which were made an exhibit to Gary Gensler's deposition. Shoffner brief at p. 9, Defendant's Exhibit F. Mr. Gensler, however, testified that he did not know where these records came from. Defendant's Exhibit E, 40:6-8. Moreover, Shoffner makes no effort to authenticate those records or lay an evidentiary foundation for them. Notably, inherent in Shoffner's argument is the contention that undue exposure to rain can result in the trusses becoming unduly susceptible to mold growth. Yet Shoffner admits that it left the trusses uncovered in its storage yard, and during transportation.

Shoffner offers no testimony, and makes no argument, to link rain during construction to mold growth on trusses. Shoffner does not even offer testimony that the trusses were exposed when it allegedly rained during construction. If the rain occurred after the homes were "dried in", it is irrelevant. Thus, Shoffner has not established the relevance of this testimony.

In addition, none of the testimony or interrogatory answers offered by Shoffner suggests—let alone proves—that any of the water observed affected the trusses. Shoffner asks the Court to speculate that the water observed—whether in the basement, the kitchen, or elsewhere—somehow made its way to the trusses and caused mold growth. At most, this is

DC #193102 v3

evidence of three isolated events involving three separate homes. Shoffner offers no testimony regarding the other 21 homes although all 24 homes had mold on the trusses.[1]

Shoffner also offers no testimony to link any of the homeowners' water intrusion allegations to any Stanley Martin action. Consequently, none of this testimony establishes that Stanley Martin committed an act of negligence, and as such cannot carry Shoffner's burden.[2]

Finally, it is well settled in Maryland that juries should determine contributory negligence. *Campbell*, 73 Md. App. at 64, 533 A.2d at 14 ("Ordinarily, the question of whether a plaintiff was contributorily negligent or assumed the risk is one for the fact finder, not the court."). "A case may not be taken from a jury on the ground of contributory negligence unless the evidence demonstrates 'some prominent and decisive act which directly contributed to the . . . [incident] and which was of such a character as to leave no room for difference of opinion thereon by reasonable minds.'" *Id.* at 64, 533 A.2d at 14 (quoting *Baltimore Transit Co. v. State ex rel. Castranda*, 194 Md. 421, 434, 71 A.2d 442, 447 (1950)). Thus, even if Shoffner could establish that it rained on these houses or that there was water in certain isolated instances in these homes, this would not rise to the level of contributory negligence:

> This Court has also stated that ". . . even if the act done [by the plaintiff as claimed as his contributory negligent action] turns out to be an error of judgment, this alone does not make the act negligent if an ordinarily prudent person may have made the same error."

*Hill v. Wilson*, 134 Md. App. 472, 492, 760 A.2d 294, 305 (2000) (quoting *Faith*, 127 Md. App. at 747, 736 A.2d at 444 (citing *Sanders v. Williams*, 209 Md. 149, 120 A.2d 397 (1956)). Since

---

[1] Shoffner also has not put forth evidence that all 24 homes were exposed to rainfall sufficient to support mold growth. Even if Shoffner could produce such evidence, it is rebutted by Mr. Cooper, who testifies that the growth patterns of mold on the trusses establish that the moisture source was not rain water after installation. Since Stanley Martin covered and elevated the trusses during storage, the only explanation is that the moisture was added while the trusses were still in the possession of Shoffner.

[2] Shoffner states that there was also mold on the party walls. While true, it is undisputed that it was wholly unrelated to the truss mold, and Stanley Martin is not seeking recovery of any costs associated with party wall clean-up.

Shoffner offers no evidence that Stanley Martin was negligent, its claims of contributory negligence must fail on summary judgment.

### C.     Stanley Martin's evidence establishes that Shoffner breached its Contract.

There is ample evidence, detailed throughout this brief, that Shoffner failed to deliver high quality trusses, that were free from deficiencies and exceeded industry standards, to Stanley Martin.  As such, there are genuine disputes of fact as to whether Shoffner breached its Contract which defeat summary judgment.

There is also ample evidence that Shoffner breached its Contract when it failed to "properly unload and store delivered materials."  Specifically, the Contract required Shoffner to cover the trusses upon delivery.  Shoffner did not cover the trusses.  Shoffner argues that Stanley Martin waived this contractual obligation because Andy Pitman, the construction superintendent, ultimately covered them.  Not only is this not a waiver, it is a direct acknowledgement of Shoffner's contractual breach.  Moreover, the Contract specifically provides that regardless of who stores or protects the trusses, Shoffner is not relieved of its "sole responsibility for any damage to material improperly stored."  Consequently, if Shoffner intends to argue that damage occurred due to improper storage, Shoffner is still contractually responsible for that damage.  Regardless, whether Stanley Martin waived any contractual requirement by its conduct is a question of fact which cannot be decided on summary judgment.  *University National Bank v. Wolfe*, 279 Md. 512, 369 A.2d 570 (1977).

Finally, pursuant to the Stanley Martin/Shoffner contract, Shoffner is obligated to correct "defects or improper workmanship" and to indemnify Stanley Martin for all damages arising from or relating to Shoffner's "failure to comply with this Contract" "act[s], omission[s], negligence or default."  Alloy Aff. Ex. A, Warranty Section, and Insurance, Section (a).

DC #193102 v3

It is undisputed that the Shoffner trusses in all 24 homes had mold and sustained damages. It is undisputed that Shoffner did not correct or clean the mold. It is also undisputed that Stanley Martin incurred significant costs to remediate mold from the trusses. Stanley Martin submits that those costs arose from and/or are related to Shoffner's failure to comply with the Contract as well as its acts, omissions, negligence and default. Shoffner has failed to indemnify Stanley Martin for those costs. As such, Shoffner has breached its contractual duties to correct defects and indemnify Stanley Martin for those defects.

Shoffner argues that it is entitled to summary judgment on Stanley Martin's breach of contract claim on the grounds that Stanley Martin failed to provide timely notice that the trusses were defective. The evidence establishes that Stanley Martin gave notice within a reasonable time of discovering that Shoffner may be responsible for the truss mold. Specifically, Stanley Martin gave Shoffner notice of the homeowner claims in November of 2000. In 2001, after further expert evaluation, Stanley Martin advised Shoffner of what experts had concluded.

Under Maryland law, the question of what is a "reasonable" time within which a buyer notifies a seller of a defect after acceptance of goods is a question of fact for the jury. *Smith v. Butler*, 19 Md. App. 467, 471, 311 A.2d 813, 816 (1973) ("Ordinarily the question of what is a 'reasonable time' in which a buyer is to give notice to the seller of breach of warranty is a question of fact for the determination of the jury based on the surrounding circumstances."). Consequently, whether Stanley Martin's notice was reasonable cannot be decided on summary judgment.

Furthermore, Stanley Martin's notice to Shoffner was reasonable because the truss defects were hidden and not discovered until testing occurred in all 24 homes. This Court ruled

on this precise issue in *Environmental Elements Corp. v. Mayer Pollack Steel Corp.*, 497 F.

Supp. 58 (D. Md. 1980), a case indistinguishable from the facts here.

In *Mayer Pollack Steel*, the plaintiff buyer bought "four large bayline columns" from the

seller and "accepted" them at the seller's facility. *Id.* at 59.  The buyer then sent the columns to a

site where they were installed in a machine called a precipitator.  Only then did they discover

that the welds on the columns were defective.  *Id.*

The plaintiff had given the seller inspection release forms in December 1975, but did not

discover the weld defects until September 1976, when it notified the seller.  *Id.* at 61.  The seller

argued that the buyer should have discovered the breach earlier, and that its delay in notifying

the seller barred recovery under UCC § 2-607—the same provision Shoffner relies on here.  The

Court rejected this argument and explained, "[m]ost of the cases cited by [seller] on this point

dealt with facts quite different from the facts of this case because either (a) the defects were

patent, or (b) where latent, the plaintiffs had delayed notice to the defendants for an unreasonable

period after they had discovered the defects." *Id.* at 61-62.  The Court then explained,

> [i]n the case at bar the defects in the welds were not visible to the naked eye.
> Upon consideration of all the facts, this court finds and concludes that [buyer] had
> no duty to discover the hidden defects in the welds before they were in fact
> discovered, and that [buyer's] claim is not barred by its failure to discover and
> give notice of the defects sooner than it did.

*Mayer Pollack Steel*, 497 F. Supp. at 62.

The *Mayer Pollack Steel* facts are indistinguishable from this case.  Like *Mayer Pollack*

*Steel*, the defects in the Shoffner-supplied trusses were latent, and could not be discovered upon

delivery.  As Matthew Cooper testified, excess moisture and mold spores are not visible to the

naked eye.  Cooper Dep. at 103:1-4.  And, due to the quick construction sequencing, those

trusses were hidden from view by other building materials before that mold became visible.

Moreover, as soon as Stanley Martin became aware that the trusses contained mold, Stanley Martin notified Shoffner. Alloy Aff. ¶¶ 18, 19, 23.

Shoffner argues that Stanley Martin should have noticed the "defect" as early as February 1999. This is both unreasonable and wholly unrealistic, for the reasons discussed above. Construction of the first duplex was just beginning at that time and construction of the other 22 homes had not yet begun. How could Stanley Martin give notice on defects with respect to trusses that were not yet delivered, even setting aside the absence of growth visible to the naked eye at the time of delivery. Accordingly, Stanley Martin's claims are not time-barred by §2-607 and summary judgment is inappropriate.

D.     **There is also a genuine dispute of material fact concerning arbitration.**

Lastly, Shoffner argues that Stanley Martin's case fails because the Stanley Martin/Shoffner Contract required Stanley Martin to demand arbitration within one year after Stanley Martin should have learned of the defects.[3] Specifically, Shoffner contends that Stanley Martin "should have had notice of any alleged defect during February 1999, as Mr. Pitman testified that construction was ongoing at that time." Shoffner Memorandum, at p. 30.

As set forth in greater detail below, the contract provision cited does not apply to claims arising after the completion of Shoffner's work, Shoffner omits a key phrase of the provision,

---

[3] Shoffner does not ask the Court to stay this action and refer it to arbitration, which is the procedure required by the Federal Arbitration Act. 9 U.S.C. § 3. Thus, even if Shoffner could argue that the dispute should be resolved in arbitration, Shoffner has failed to bring the issue before the Court. Even if Shoffner had asked the Court to stay the action, Shoffner waived its claim that this dispute is arbitrable by "substantially utilizing the litigation machinery that to subsequently permit arbitration would prejudice the party opposing arbitration." *Fraser v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 817 F.2d 250, 252 (4th Cir. 1987) (citing *Maxum Foundations, Inc. v. Salns Corp.*, 779 F.2d 974, 981 (4th Cir. 1985). Stanley Martin filed this action more than a year and a half ago, and Shoffner waited until after discovery—which was extended by the Court several times upon agreement of the parties—had closed before Shoffner filed this motion.

In the meantime, Shoffner took full advantage of the discovery process, which it would not have had in arbitration. Shoffner served 16 requests for production of documents, 23 interrogatories, took eight depositions and has reserved the right to take three more depositions. Stanley Martin's expert witness, Elliott Horner, was required to produce an expert report, which would not have occurred in arbitration. Shoffner has clearly waived any claim to arbitration.

DC #193102 v3

and it misquotes the portion it does cite. It is not necessary to reach those issues, however, because even accepting Shoffner's interpretation of the agreement at face value, its argument fails.

The assertion that Stanley Martin knew of this dispute in February of 1999 is truly absurd. Construction on 22 of the 24 homes at issue had not even started in February 1999, no homeowner had yet complained to Stanley Martin, no mold was yet visible to the naked eye, and it was more than two years before Mr. Cooper informed Stanley Martin that it appeared that Shoffner was responsible for the mold. After the first homeowner complained it took months to investigate all 24 homes and determine the source of the elevated moisture. It is hard to understand how Shoffner can even argue that a limitations period started running before the trusses for 22 of the homes had even been delivered. Indeed, Shoffner argues that a one-year period to demand arbitration started to run when Stanley Martin *should have* learned of a defect. In fact, the provision cited refers to the date that a dispute is "known" to Stanley Martin. Surely this dispute was not "known" prior to the date most trusses were even delivered, and any mold became visible.

While this is dispositive of Shoffner's argument on summary judgment, Shoffner's position is also based on an incorrect interpretation of the Contract. The provision Shoffner relies on is limited to the Contract's Default by Vendor/Termination section, and does not apply to Stanley Martin's claim. In short, it applies to default terminations and other claims arising before the completion of Shoffner's work, but not to disputes arising after completion of that work, such as those here. This is clear for four reasons.

First, the alleged "time bar" provision is located in the Default by Vendor/Termination section of the Contract. This is separate and independent from the Indemnity, Warranty and

other provisions imposing post-completion obligations, which form the basis for Stanley Martin's claims. Stanley Martin's President, Steven Alloy, states that the limitation clause applies only to defaults during the work and resulting terminations—not to claims for indemnity or latent defect. Alloy Aff. ¶ 32.

Second, if there were any doubt that the parties intended the cited provision to apply prior to completion of the work, that doubt is eliminated by portions of the provision which Shoffner omitted from its brief. The entire provision is as follows:

> The demand for arbitration must be made within a reasonable time after written notice of the dispute or claim has been given to the other party, <u>but in no event shall be made after final acceptance of the work by the General Contractor</u> or one year after the claim or dispute became known to the complaining party, <u>whichever shall first occur.</u> (Emphasis added)

If this clause applied to claims asserted under any provision of the Contract, then neither party could assert a claim after final acceptance. For instance, Stanley Martin could accept Shoffner's work and refuse to pay. Likewise, Stanley Martin could refuse to release Shoffner's retention, which it was entitled to have after final acceptance. Default by Vendor/Termination(c). Under those circumstances, Shoffner could not sue to recover the payment; its claim would be barred because it would be asserted after final acceptance by Stanley Martin. This cannot be the case. *See Cadem v. Nanna*, 243 Md. 536, 544, 221 A.2d 703, 708 (1966) ("[T]he courts will prefer a construction which will make the contract effective rather than one which will make it illusory or unenforceable.") The plain language of the provision shows that it is limited to terminations.

Third, other portions of the Contract govern the parties' rights and obligations after final acceptance of the work. Examples in addition to those requiring final payment and the release of retention after final acceptance of the work include the following.

38

- Shoffner's warranty extended "for a period of one (1) year from the date of settlement between owner and first purchaser and/or fourteen (14) months from all applicable final inspection on the hour or building . . ."

- "Additionally, corrections due to defects or improper workmanship may be required at any time, even after the warranty expires."

Likewise, there is an indemnification provision in the "Default by Vendor/Termination" section of the Contract, which references wrongful termination, but a distinct indemnification obligation later in the Contract, covering third-party claims whenever they arise. Shoffner's interpretation would apparently void the subsequent indemnity obligations (located in the "Insurance" section of the Contract), even though they are separate from the indemnity obligations.[4]

Finally, Shoffner's conduct was contrary to its current contentions. In response to the homeowner claims, Shoffner entered into the Tolling Agreement with Stanley Martin. If Shoffner truly believed that Stanley Martin's claims were barred in February 2000, it would not have entered into that Tolling Agreement, and after its termination engage in a year and a half of expensive litigation before making this argument. Under Maryland law, courts can use the parties' conduct to shed light on the proper interpretation. *Mattingly Lumber Co. v. Equitable Bldg. & Sav. Ass'n*, 176 Md. 403, 5 A.2d 458 (1939) (Construction which parties place on contract by their conduct must be given weight.); *Eisenberg v. Air Conditioning, Inc.*, 225 Md. 324, 334, 170 A.2d 743, 747 (1961) ("In determining what interpretation was given to a contract by the parties to it, the acts and declarations of the parties themselves may be considered."); *Hughes v. Thurman*, 213 Md. 169, 177, 131 A.2d 479, 483 (1957).

---

[4] In short, Shoffner would have the Court ignore much of the Contract, and render those provisions it does cite non-sensical. This would violate Maryland principles of contract interpretation. *See Walker v. Department of Human Resources*, 379 Md. 407, 421, 842 A.2d 53, 61 (2004) ("We also attempt to construe contracts as a whole, to interpret their separate provisions harmoniously, so that, if possible, all of them may be given effect."). *Chew v. DeVries*, 240 Md. 216, 221, 213 A.2d 742, 744-45 (1965) ("[I]f a reconciliation can be effected by a reasonable interpretation, such interpretation should be given to the apparently repugnant provisions, rather than nullify any.")

In sum, the contract provision cited by Shoffner does not apply here, but even if it did, under no conceivable interpretation of the evidence, much less an undisputed interpretation, did Stanley Martin know of its dispute with Shoffner in February 1999, when construction operations at the Project were just commencing.

## V.   CONCLUSION

For the reasons stated herein, Stanley Martin respectfully requests that the Court deny Shoffner's Motion for Summary Judgment.

Dated:  June 24, 2005

Respectfully submitted,

Melissa Callahan Lesmes (Bar No. 22864)
Michael S. McNamara (Admitted *pro hac vice*)
Thelen Reid & Priest LLP
701 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C.  20004
202-508-4000

Counsel for Plaintiff
Stanley Martin Companies, Inc.

DC #193102 v3

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Plaintiff Stanley Martin Companies, Inc.'s

Opposition to Defendant Universal Forest Products Shoffner LLC's Memorandum in Support of

Motion for Summary Judgment was sent on June 24, 2005, by e-mail to:

> Malcolm S. Brisker
> Goodell, DeVries, Leech & Dann, LLP
> One South Street, 20th Floor
> Baltimore, MD  21202


_____
Michael S. McNamara

DC #193102 v3