**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| **STANLEY MARTIN COMPANIES, INC.** | |
| **Plaintiff,** | **Civil Action No.  AW-04-597** |
| **v.** | |
| **UNIVERSAL FOREST PRODUCTS SHOFFNER LLC** | |
| **Defendant.** | |

## MEMORANDUM OPINION

Plaintiff Stanley Martin Companies, Inc. ("SMC") brings this action against Defendant Universal Forest Products Shoffner LLC ("Shoffner"), asserting claims of breach of contract, negligence, contractual indemnification, common law indemnification, and contribution. Presently pending before the Court are Shoffner's Motion for Summary Judgment [30] and SMC's Motion to Strike Inadmissible Evidence Offered by Defendant Universal Forest Products Shoffner LLC in Support of its Motion for Summary Judgment [41]. The Court has reviewed the pleadings and applicable law and has determined that a hearing is unnecessary. *See* Local Rule 105(6) (D. Md. 2004). For the reasons that follow, Shoffner's Motion for Summary Judgment and SMC's Motion to Strike are each granted-in-part and denied-in-part.

### FACTUAL & PROCEDURAL BACKGROUND

The following facts are taken in the light most favorable to the non-movant. SMC is a Washington-area homebuilder and developer. Shoffner is a manufacturer and distributor of wood products. In January of 1997, the parties entered into a contract in which Shoffner agreed to supply

1

SMC with wood trusses[1] to be used in the construction of twenty-four duplex townhouses in the Quince Orchard Park Development in Gaithersburg, Maryland.  The trusses were to be used in the assembly of the homes' floors and roofs.

SMC commenced building the first townhouse in early 1999 and completed all twenty-four homes within a year, utilizing trusses that were delivered to the construction site between January 1999 and September 1999. The first buyers moved into the development in mid-1999, while other homes were still under construction. In late 1999, one homeowner, Elizabeth Gensler, informed SMC that she had discovered mold on the exposed area of the trusses in her basement. SMC investigated and had the mold "bleach cleaned." This remedy apparently proved inadequate, as more mold appeared on Ms. Gensler's exposed trusses. Ms. Gensler then shared her concerns with her fellow homeowners, and they too began to report mold growth on the exposed trusses in their homes. SMC hired Mantech Environmental to investigate the homeowners' reports and to take air and surface samples from the townhouses.

It was at this time that certain homeowners began to voice their complaints directly to the City of Gaithersburg, which responded by engaging an organization known as Patuxent Environmental Group, Inc. ("Patuxent") to review the work done by Mantech Environmental and to investigate several of the homeowners' claims. Following Patuxent's preliminary investigation, SMC sent Shoffner a letter in November of 2000, stating that the Shoffner trusses likely "played a substantial role" in the mold growth. In January of 2001, facing growing numbers of homeowner complaints, SMC determined that a more thorough investigation was necessary. As a result, SMC

---

[1]A truss is a "rigid framework designed to support a structure." *Webster's II New Riverside University Dictionary* 1240 (The Riverside Publishing Company 1994).

2

directly retained Patuxent and its principal investigator, Matthew Cooper, to inspect all twenty-four of the homes. These extensive inspections, which involved the removal of drywall and the examination of ceiling cavities, took place during the spring of 2001.

Patuxent's investigation revealed that the trusses of all twenty-four homes were contaminated with mold. However, according to Cooper, there was no mold contamination of the wood building materials that were adjacent to the trusses. Following the investigation, Patuxent generated protocols for the remediation of mold in each home. These protocols were based on the New York City Remediation Guidelines, which were, at that time, the only nationally recognized standards for mold remediation. SMC contracted with an outside firm to conduct the necessary work, while Patuxent was directed to oversee the process. Each homeowner consented in writing to the implementation of the remediation protocols.

In early 2002, while the remediation of the homes was taking place, fourteen of the twenty-four homeowners filed suit against SMC and Shoffner, seeking a combined $150 million in damages. After consulting with one another, SMC and Shoffner concluded that a joint defense against the homeowners' claims would be in their mutual interest. Accordingly, they agreed to table the dispute between them and abide by a "Tolling Agreement." This agreement suspended all applicable limitations periods, yet reserved for each party the right to file suit at a later date.

The remediation of the Quince Orchard Park development was completed in late 2003, at a cost of nearly $2 million. Their residences no longer contaminated with mold, the fourteen homeowners who had filed suit agreed to settle their claims for nuisance value. In January of 2004, SMC commenced this action against Shoffner, seeking to recover its remediation expenditures. After extensive discovery, Shoffner filed its Motion for Summary Judgment in May of 2005. SMC's

Motion to Strike followed soon afterward. Those motions are ripe, and an opinion is now issued.

## DISCUSSION

### I.   <u>Evidentiary Matters</u>

Prior to addressing the merits of Shoffner's Motion for Summary Judgment, this Court must evaluate the admissibility of certain evidence offered in support of that motion. Attached to Shoffner's motion were twelve exhibits, consisting primarily of deposition transcripts and responses to interrogatories. These exhibits can be further divided into two categories: those arising from the instant dispute between SMC and Shoffner, and those generated in previous litigation between SMC and the Quince Orchard Park homeowners. SMC contends that, because of Shoffner's failure to file an affidavit authenticating its exhibits, none of the evidence offered by Shoffner should be considered by this Court. In addition, SMC objects to various deposition transcripts that are unaccompanied by signed court reporter certificates, and argues that certain exhibits should be excluded because they are hearsay.

Federal Rules of Civil Procedure Rule 56(e) provides that:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

Fed. R. Civ. P. 56(e). This rule sets out the standard for any supporting affidavits that a party chooses to attach to a motion for summary judgment – it does not, however, *require* that motions for summary judgment be accompanied by supporting affidavits. Indeed, Rule 56(a) provides that plaintiffs may "move with or without supporting affidavits for a summary judgment," and 56(b) offers defendants an identical choice. Fed. R. Civ. P. 56(a), (b).

The question here is whether submission of an affidavit is a prerequisite for the proffering of other types of evidence. Rule 56(e) suggests that it is not, because it provides that one party's affidavits may be supplemented or opposed "by depositions, answers to interrogatories, *or* further affidavits." Fed. R. Civ. P. 56(e) (emphasis added). The disjunctive "or" implies that a party has the right to offer evidence such as depositions and answers to interrogatories without being required to attach an accompanying affidavit. Indeed, Rule 56(c) states that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, *if any*, show that there is no genuine issue as to any material fact . . . ." Fed. R. Civ. P. 56(c) (emphasis added). The most natural interpretation of the rule  is that an affidavit is not the *sine qua non* for the admission of other forms of evidence, provided that such evidence is otherwise admissible.[2] Therefore, Shoffner's exhibits in support of its motion for summary judgment will not be automatically excluded because they were not supplemented by an affidavit.

SMC also contends that Shoffner's deposition transcripts should be stricken because they were accompanied by unexecuted court reporter certifications. However, SMC cites only one case, from the Southern District of California, in which deposition testimony was excluded because of the failure to submit a signed certification from the reporter. *See Pavone v. Citicorp Credit Servs., Inc.*, 60 F. Supp. 2d 1040, 1045 (S.D. Cal. 1997). *Pavone* is not binding authority on this Court. Moreover, Shoffner provides some justification for its failure to tender all of the certificates.

---

[2]*Goldman v. Summerfield*, 214 F.2d 858 (D.C. Cir. 1954), cited by SMC for the proposition that Shoffner was required to file an affidavit, is inapposite. In *Goldman*, the documents found to be inadmissible without an affidavit included various copies of letters and a copy of a report, materials which this Court views as much less reliable than the documents (deposition transcripts and interrogatory responses) at issue here.

Shoffner asserts that it was unable to attach executed court reporter certificates because they are in SMC's sole possession, and SMC was either unwilling or unable to provide Shoffner with copies. In addition, in its response to SMC's Motion to Strike, Shoffner has attached letters and emails documenting its efforts to acquire the signed reporter certificates, and has provided some of the signed certificates that were missing from its Motion for Summary Judgment. Although "[i]t is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment," *Solis v. Prince George's County*, 153 F. Supp. 2d 793, 798 (D. Md. 2001), the situation here is hardly analogous to the one presented in *Solis*, a decision of this Court cited by SMC in its Motion to Strike, in which a plaintiff attempted to submit unsworn eyewitness statements and an unsworn expert report. Nor do *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993) (on  the day of summary judgment hearing, plaintiff proffers unsigned letters and unsigned minutes of a meeting); or *Evans v. Technologies Applications & Service Company*, 80 F.3d 954, 962 (4th Cir. 1996) (portions of plaintiff's affidavit stricken because they consisted of unsupported allegations, conclusory statements, and hearsay) appear to have significant bearing on the question of whether deposition transcripts with unsigned reporter certificates are admissible.

On balance, this Court is satisfied that the authentication requirement of Federal Rules of Evidence Rule 901 – that the proponent introduce evidence sufficient to support a finding that the document is what the proponent claims – has been met here. In particular, this Court finds it difficult to understand SMC's objection to excerpts from depositions (i) taken in the course of this very litigation, (ii) at which SMC was represented by its current counsel, (iii) transcripts of which are surely in SMC's possession. Accordingly, Shoffner is not precluded from relying upon deposition excerpts whose only deficiency is the lack of a signed reporter certificate.

Shoffner's reliance on depositions and interrogatory responses from prior litigation between SMC and the Quince Orchard Park homeowners is more problematic. Such evidence is hearsay, and would therefore ordinarily be as inadmissible in support of a summary judgment motion as it would be at trial. *See Maryland Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251-52 (4th Cir. 1991) ("hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment"). Shoffner argues, however, that the depositions and interrogatory responses are admissible under the hearsay exception of Federal Rules of Evidence Rule 804(b)(1), which permits former testimony elicited "in the course of the same or another proceeding, if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Fed. R. Evid. 804(b)(1). Shoffner points out that the homeowners' testimony was taken in a previous action in which SMC was a named party and that it concerned the same set of facts and circumstances that are at issue here. Therefore, Shoffner suggests, SMC has had the requisite opportunity to develop the homeowners' testimony, and that SMC's motives and interests were sufficiently similar in the previous litigation to justify making the homeowners' past testimony admissible in the case at hand.

SMC argues that its motives today are substantially different than when the homeowners' suits were pending; that, given the Tolling Agreement in place at the time, SMC's objective when conducting the homeowners' depositions was to defend against their claims, not to develop a record that might be used against Shoffner at a later date. Although the Court suspects that eventual litigation against Shoffner was always prominent in SMC's mind, we cannot say that the two disputes bear sufficient similarities to permit Shoffner to rely on depositions and interrogatory responses from prior litigation in which it and SMC were not adverse parties. SMC's motives are

considerably different now than when it was defending against the homeowner suits, and when "the motives differ, the testimony may not be introduced." *Horne v. Owens-Corning Fiberglass Corp.*, 4 F.3d 276, 282 (4th Cir. 1993). In addition, Rule 804(b)(1) applies when the declarant is unavailable as a witness, and no showing of the homeowners' unavailability has been made.[3] Therefore, the previous depositions and interrogatory responses of the homeowners are not admissible in the instant litigation.

In sum, the Court will grant SMC's Motion to Strike, but only with respect to evidence arising from prior litigation between SMC and the homeowners.[4] SMC's Motion to Strike is otherwise denied.

## II.   Shoffner's Motion for Summary Judgment

### Standard of Review

Summary judgment is appropriate only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).  Once the moving party discharges its burden by showing there is an absence of evidence to support the nonmoving party's case, *Catrett*, 477 U.S. at 325, the nonmoving party must come forward with specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of

---

[3]In fact, Shoffner notes in its Memorandum in Opposition to SMC's Motion to Strike that "if SMC's claims survive summary judgment, Shoffner intends to call homeowners Waks, Selby, and Reddy as well as other Quince Orchard Park homeowners involved to testify at trial in this litigation." Def.'s Mem. at 6 n.5.

[4]The Court grants SMC's motion with respect to Shoffner Exhibits C (Deposition of Elizabeth Gensler), D (Deposition of Dana West), E (Deposition of Gary Gensler), F (Weather Chart), and H (Interrogatory Responses of Joseph Waks, Thomas Reddy, and Roland Selby).

the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991) (internal citations omitted). Summary judgment will be granted unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

### Count I: Breach of Contract

The truss purchase agreement ("Agreement") between SMC and Shoffner states that Shoffner will provide materials that "are free from all deficiencies and defects," "exceed industry standards," and "are of high quality pursuant to industry practices and procedures." SMC contends that Shoffner breached the Agreement by supplying trusses that "were deficient and defective in that they did not meet industry standards, contained or were infected with mold and/or mold spores, and/or were substandard and defective in that they were not sufficiently dried out, and/or were of such deficient quality that they were unduly susceptible to mold growth." In addition, SMC asserts that Shoffner breached contractual obligations relating to storage of the trusses once they were delivered to the work site, particularly its obligations to "protect all materials by placing them in secured areas, covering them with polyurethane (supplied by the General Contractor), and elevating them off ground or basement floor." SMC also cites Shoffner's failure to comply with warranty provisions requiring it to replace unacceptable materials "at no additional cost" and to make "corrections due to defects or improper workmanship . . . at any time." Finally, SMC claims that Shoffner breached contractual provisions requiring it to indemnify and hold SMC harmless "from any and all costs or damages, including attorney's fees, arising from any non-compliance," and "from any and all liability, claims, lawsuits, damages and/or demands, arising from or relating to any act omission [sic], negligence or default."

Shoffner asserts a variety of defenses in its motion for summary judgment. Specifically, Shoffner argues that: (1) SMC is barred from recovery because of its failure to timely demand arbitration; (2) SMC failed to reject the goods in a timely manner and failed to provide Shoffner with timely notice of any alleged breach; and (3) SMC, through its conduct, waived contractual provisions having to do with delivery and storage of the trusses.[5] We address these arguments in turn.

<u>Arbitration</u>

The "Default by Vendor/Termination" portion of the Agreement provides:

> Any and all disputes or claims of any nature between the General Contractor and Vendor arising from or relating to this Contract, or any breach thereof, excluding any claims waived by the making and/or acceptance of partial or final payments, shall be submitted to arbitration . . . unless the parties mutually agree in writing to waive arbitration.

> Notice of demand for arbitration shall be filed in writing with the other party to this Contract . . . . The demand for arbitration must be made within a reasonable time after written notice of the dispute or claim has been given to the other party, but in no event shall be made after final acceptance of the work by General Contractor or one year after the claim or dispute became known to the complaining party, whichever shall first occur. . . . This arbitration clause shall not relieve Vendor from any and all warranty obligations under this contract and/or any warranty obligations imposed by law.

Because the arbitration clause allows for "one year after the claim or dispute became known to the complaining party" to demand arbitration, Shoffner suggests that if no such demand is made within the prescribed time period, the complaining party has waived all rights to either arbitrate or litigate its claims. Shoffner argues that SMC should have "known" of any defects in the trusses in February

---

[5]Shoffner also argues that SMC has failed to present evidence sufficient to create a genuine dispute of material fact as to whether the trusses were defective upon delivery, and that this failure is fatal to all of SMC's claims. The Court takes up this issue below, in the portion of this opinion addressing SMC's negligence claim.

1999, upon their initial delivery to the construction site. Because SMC first contacted Shoffner regarding the mold problem in November 2000, Shoffner asserts that SMC is barred from recovery.

SMC responds by arguing that it had no knowledge of the dispute in February of 1999 – that no mold was yet visible to the naked eye, that no homeowners had yet complained, and that construction of the majority of homes had not even commenced at that time. SMC gained its first comprehensive understanding of the nature and extent of the problem in late 2000, after the investigation by Patuxent and Matthew Cooper.

SMC further contends that the arbitration clause does not even apply to the claims at issue here – that it is limited to default terminations and other claims that may have arisen before the completion of Shoffner's delivery of the trusses, not claims that originated afterwards. SMC points out that the arbitration clause is located in the "Default by Vendor/Termination" section of the Agreement, and that giving it the reading suggested by Shoffner renders it inconsistent with other provisions of the contract. In particular, the clause provides that arbitration cannot be demanded "after final acceptance of the work by General Contractor," yet other provisions impose obligations that persist after final acceptance. For example, the "Warranty/Inspections" section of the Agreement provides that Shoffner's warranty extended "for a period of one year from the date of settlement between owner and first purchaser and/or (14) fourteen months from all applicable final inspections . . . on each individual house or building" and requires Shoffner to make corrections "due to defects or improper workmanship . . . at any time, even after the warranty expires." In addition, the "Insurance" section of the Agreement contains an indemnity clause that would be rendered nugatory with respect to any third-party claims arising after completion if Shoffner's reading of the contract is correct. Finally, SMC argues that Shoffner's conduct sheds light on the

proper interpretation of the arbitration clause – that Shoffner would not have entered into the Tolling Agreement in February of 2002 if it truly believed that SMC's claims were barred in 2000, and would not have engaged in a year and a half of litigation and discovery if it thought that the arbitration clause was applicable.

As a general matter, this Court looks favorably upon freely-negotiated arbitration agreements. Arbitration provisions in contracts affecting interstate commerce, such as this one, are governed by the Federal Arbitration Act ("FAA"), which embodies "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941 (1983); *O'Neil v. Hilton Head Hosp.*, 115 F.3d 272, 274 (4th Cir. 1997). This strong policy requires courts to "rigorously enforce agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221, 105 S.Ct. 1238, 1242-43 (1985). As such, "any doubts concerning the scope of the arbitrable issues should be resolved in favor of arbitration." *Moses*, 460 U.S. at 24-25, 103 S.Ct. at 941. The FAA " leaves no place for the exercise of discretion by the district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218, 105 S.Ct. 1238, 1241 (1985). Here, however, neither party seeks to compel the other to arbitrate. Instead, citing SMC's failure to demand arbitration, Shoffner moves for summary judgment against all of SMC's claims. The result of this would be to leave SMC without any remedy.

The Court is not convinced that the parties intended for noncompliance with the arbitration clause to constitute waiver of judicial remedies. However, even if that were the case with respect to disputes falling within the scope of the clause, we find that SMC has raised serious doubts as to

whether the Agreement's arbitration clause encompasses this controversy. While the clause's language referring to "[a]ny and all disputes of any nature" appears broad, its purported universal applicability is contradicted by a later provision, which states that the arbitration clause "shall not relieve Vendor from any and all warranty obligations under this contract and/or warranty obligations imposed by law." As noted previously, SMC bases its claims in part on the Agreement's warranty provisions. Moreover, the Court agrees with SMC that the arbitration clause can most reasonably be read to apply to disputes arising prior to the completion of construction – otherwise, the Agreement's numerous indemnity provisions make little sense.   Maryland contract law provides that "an interpretation which is fair and reasonable will be preferred to one which leads to an unreasonable result." *Stanbalt Realty Co. v. Commercial Credit Corp.*, 42 Md. 538, 545, 401 A.2d 1043, 1047 (1979); *see First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 1924 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.") Accordingly, the Court finds that SMC's claims are not barred by its failure to pursue arbitration.

Rejection of Goods/Timeliness of Notice

Shoffner also asserts that SMC failed to reject the allegedly defective trusses in a timely manner and failed to provide Shoffner with timely notice of its alleged breach.[6] Both these arguments center on the question of when SMC had actual or constructive knowledge that the trusses were defective. Shoffner suggests that, because a representative of SMC inspected the trusses at the

---

[6]Shoffner cites Maryland Commercial Law Article Sections 2-602 ("Rejection of goods must be within a reasonable time after their delivery or tender"), 2-606 ("Acceptance of goods occurs when the buyer fails to make an effective rejection"), and 2-607 ("[T]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy").

13

time of delivery and performed "daily walk throughs" of the properties, any alleged defects were discoverable in February 1999, when the trusses were first brought to the work site, or within the next several weeks, when the mold should have been visible to the naked eye. This argument is unpersuasive, however, because it misconstrues SMC's claims. SMC does not contend that the trusses necessarily contained mold at the time of delivery; rather, SMC suggests that the trusses may have been *unduly susceptible* to mold growth because they contained excess moisture when delivered, and this excess moisture would not have been visible to the naked eye. In other words, the defect may have been mold infestation, or it may have been elevated moisture levels which led to subsequent mold infestation. This may explain why neither the initial inspections of the trusses or the subsequent "walkthroughs" of the homes would necessarily have revealed any defects.[7]

Both parties cite to a decision of this court, *Environmental Elements Corp. v. Mayer Pollack Steel Corp.*, 497 F. Supp. 58 (D. Md. 1980), although obviously for different propositions. Shoffner cites *Mayer Pollock Steel* for its holding that although the timeliness of notice of breach is ordinarily a question of fact, "where the facts are undisputed and but one inference can be drawn therefrom as to the reasonableness of the notice, the question is one of law." *Id.* at 61. Here, however, material facts concerning the condition of the trusses upon delivery remain in considerable dispute. SMC suggests that the facts of *Mayer Pollock Steel* bear significant similarities to those of the instant case, and that it provides guidance as to how a court should evaluate notice of latent defects. *Mayer*

---

[7]This is also why the Court cannot agree with Shoffner's assertion that "either the trusses (1) had visible mold growth at the time of their installation, in which case SMC would have had a duty to notify Shoffner at the time of installation; or (2) the trusses had no visible mold growth at the time of installation and mold grew on the trusses and became visible after installation, in which case the growth would have been the result of construction conditions beyond the control of Shoffner." Def.'s Rep. at 15 n.23. Shoffner fails to consider a third option, under which the trusses were excessively moist at the time of delivery because of manufacturing or storage conditions that *were* under Shoffner's control.

*Pollock Steel* had to do with defects that were invisible to the naked eye – specifically, defective welds in four metal columns. *Id.* at 59. The defects were discovered approximately one year following delivery, after the buyer performed ultrasonic testing on the welds. *Id.* at 61. The seller argued that the buyer should have discovered the breach at or near the time of acceptance, but the court ruled that because "plaintiff had no duty to discover the hidden defects in the welds before they were in fact discovered . . . plaintiff's claim is not barred by its failure to discover and give notice of the defects sooner than it did." *Id.* at 62.  Here, if the "defect" in the trusses was their elevated level of moisture, then SMC similarly "had no duty to discover the hidden defect" at the time of delivery.

Shoffner also argues that, at the very latest, SMC had notice of the defect in late 1999, when the first homeowners began complaining of mold. Therefore, Shoffner asserts, SMC's November 2000 letter to Shoffner constituted untimely notice. SMC did not, however, delay without justification before deciding to contact Shoffner. To the contrary, SMC awaited the results of a professionally conducted investigation, notifying Shoffner once the investigator concluded that the wood trusses were the likely cause of the mold growth.  SMC's actions appear reasonable under the circumstances, given that the mold may have emanated from any number of sources.  Consequently, the Court finds that SMC's breach of contract claims are not barred because of its alleged failure to timely reject the trusses or timely provide notice that they were defective.

<u>Waiver</u>

Finally, Shoffner contends that it cannot be held in breach a provision in the Agreement requiring it to "protect all materials by placing them in secured areas, covering them with polyurethane (supplied by the General Contractor), and elevating them off ground or basement

floor," because SMC waived this term of the contract by its conduct. The Court agrees. Shoffner has presented uncontroverted evidence that Mr. Pitman, SMC's construction manager, assumed control over the trusses once they were delivered to the site. Mr. Pitman took responsibility for placement of the trusses, for covering them in polyurethane, and for elevating them off the ground. Maryland law clearly provides that parties may waive the terms of a written contract through their conduct. *See University National Bank v. Wolfe*, 279 Md. 512, 522, 369 A.2d 570 (1971); *Pumphrey v. Pelton*, 250 Md. 662, 670, 245 A.2d 301 (1968) ("the conduct of the parties to a contract may be evidence of a subsequent modification of their contract") (citing 2 *Williston on Contracts* § 623 (3d ed. Jaeger 1959)). It is unrealistic to suggest that, because of contrary terms in the Agreement, Shoffner's delivery personnel should have refused to allow Mr. Pitman, the site construction manager, to assume responsibility for the trusses' placement and storage. Therefore, to the extent that it rests on Shoffner's failure to properly place and store the trusses, SMC's breach of contract claim fails.

### Count II: Negligence

Count II of SMC's complaint states a claim for negligence. In Maryland, to establish a cause of action of negligence, a plaintiff show duty, breach, causation, and damages. *Jacques v. First National Bank of Maryland*, 307 Md. 527, 531, 515 A.2d 756 (1986). In a products liability case, a plaintiff must prove: "(1) the existence of a defect; (2) the attribution of the defect to the seller; and (3) a causal relationship between the defect and the injury." *Virgil v. "Kash N' Karry" Service Corp.*, 61 Md. App. 23, 30, 484 A.2d 652 (1984) This standard applies whether a claim is characterized as negligence, strict liability, or breach of warranty. *Watson v. Sunbeam Corp.*, 816 F. Supp. 384, 387 n.3 (D. Md. 1993) (citations omitted). SMC alleges that Shoffner breached its duty

to provide non-defective wood trusses; that its delivery of defective trusses resulted in property damage and, in some cases, bodily injury; and that, as a direct and foreseeable result of Shoffner's breach, SMC incurred significant costs in defending against the homeowners' lawsuits and conducting a remediation program of the townhouses. In its Motion for Summary Judgment, Shoffner argues that SMC has failed to present legally sufficient evidence showing that the trusses were defective. Shoffner also asserts SMC's negligence claim is barred by the doctrine of contributory negligence.

<u>Product Defect</u>

Whether SMC has presented sufficient evidence to demonstrate that the trusses were defective at the time of delivery is central to our disposition of Shoffner's Motion for Summary Judgment. If SMC is unable to present evidence sufficient to establish a genuine dispute of material fact as to this issue, then both its breach of contract and negligence claims necessarily fail. Shoffner argues that SMC has failed to meet its burden – that SMC's designated expert, Dr. W. Elliott Horner, based his allegations of product defect on nothing more than "surmise, conjecture, or speculation," and that his testimony is unreliable and must be excluded under *Daubert* and Rule 702 of the Federal Rules of Evidence. In its response brief, SMC argues that although Dr. Horner would be able to withstand a *Daubert* challenge, SMC will, for purposes of this motion, rely on the affidavit and deposition testimony of Matthew Cooper. Mr. Cooper investigated the mold growth and supervised the remediation of the homes, and has been designated by SMC as a "hybrid" fact/expert witness.[8]

--------

[8]Shoffner challenges Mr. Cooper's designation as a fact/expert witness, arguing that he doesn't fall within the category established for hybrid witnesses such as treating physicians, and that as a non-hybrid expert, his failure to file a Rule 26(a)(2) expert disclosure renders his testimony inadmissible. Although a treating physician is the "quintessential example" of the hybrid fact/expert witness, "it is a mistake to focus solely on the status of the expert, instead of the nature of the testimony which will be offered at trial." *Sullivan v. Glock*, 175 F.R.D. 497, 500

Mr. Cooper's testimony is sufficient to create a dispute of material fact and stave off Shoffner's Motion for Summary Judgment. Mr. Cooper is a "Certified Indoor Environmentalist," who is "often contacted to conduct independent investigations" and has "studied mold growth and the microbiology of mold." Cooper Dec. ¶ 6. Mr. Cooper has first-hand knowledge of the investigation of mold growth at the Quince Orchard Park Development and initially became involved in this matter at the request of the City of Gaithersburg, a non-interested third party. He has stated his belief that excess moisture within the trusses themselves was the cause of the mold, relying on his observations that: (1) no other wood components in the same area as the trusses exhibited visible signs of mold growth; (2) no other sources of moisture that would have affected all twenty-four homes were discovered; (3) the specific patterns of mold growth seen on the trusses were inconsistent with external sources of moisture, such as rainfall during construction; and (4) the twenty-four homes were built during different times of the year, under differing weather conditions, yet all of them contained mold on the trusses but not other wood-based construction materials. While this may be circumstantial evidence, a product defect is demonstrable through "circumstantial proof based on an inference of a defect from a weighing of several factors." *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 408 (D. Md. 2001).

In *Harrison v. Bill Cairns Pontiac, Inc.*, 77 Md. App. 41, 549 A.2d 385 (1988), the court

---

(D. Md. 1997).

The standard articulated by *Sullivan* court, which sought to determine whether a particular physician fell into the "hybrid" category, was to look at "the extent that the source of the facts which form the basis for a treating physician's opinions derive from information learned during the actual treatment of the patient – as opposed to being subsequently supplied by an attorney involved in litigating a case involving the condition or injury." *Id.* at 501. Here, Mr. Cooper's opinions derive from information learned during "actual treatment" of the mold problem, rather than being subsequently supplied by counsel for SMC. Accordingly, Mr. Cooper is a valid fact/expert witness under Local Rule 104(10), and his testimony will be admitted.

cited five factors to be weighed when determining whether a product defect may be inferred from circumstantial evidence: (1) expert testimony as to possible causes; (2) the occurrence of the accident a short time after the sale; (3) same accidents in similar products; (4) the elimination of other causes of the accident; (5) the type of accident that does not happen without a defect. *Id.* at 51.

Here, there is testimony from Mr. Cooper that the mold was most likely caused by excess moisture within the trusses at the time of delivery. Shoffner has provided no expert testimony in response. The first factor clearly weighs in favor of SMC.

Whether this "accident" occurred a "short time" after the sale is less obvious; complaints of mold growth began immediately after the first homeowners moved in, yet the trusses were not singled out as the probable source of the mold growth until over a year after final delivery. *Compare Harrison*, 77 Md. App. at 53 (five years after original sale is not a short time) *with Virgil*, 61 Md. App. at 33 (two or three months after sale is a short time). In *Watson*, the court held that when ten months passed between the purchase of electrical blanket and that blanket's alleged spontaneous combustion, it was "well within the province of the jury to determine what inference, if any, to draw under these circumstances" 816 F. Supp. at 388. The *Watson* court concluded that the timing of the accident weighed in favor of the plaintiffs. *Id.* at 389. In the present case, we find that the discovery of mold immediately following construction weighs in favor of SMC.

There is some controversy over the third factor. SMC's interrogatories concerning mold growth in Shoffner trusses under similar circumstances went unanswered, and there are some vague, unsubstantiated allegations that moldy Shoffner trusses were at one point delivered to a construction project unaffiliated with SMC. Without additional evidence, the Court must disregard these allegations. In addition, SMC claims that mold growth in all twenty-four homes demonstrates that

19

the same accident occurred in a similar product. We agree with Shoffner that SMC must point to products outside of the instant litigation to demonstrate the occurrence of the same accident in a similar product. In *Watson*, an unverified claim of a single similar accident was viewed as "essentially neutral." *Id.* at 389. Likewise, we find that the third factor here is neutral.

The fourth factor requires the elimination of other causes of the accident. Mr. Cooper has opined that none of the isolated sources of moisture that were discovered in the homes, such as leaky toilets or improperly sealed pipes, contributed to the mold that grew on the trusses. He also testified that the pattern of mold growth observed on the trusses was inconsistent with moisture that might have been introduced during the construction process. For example, according to Mr. Cooper, rainwater typically affects higher-situated trusses to a greater degree than lower-situated ones, yet such a pattern of mold growth was not observed here. While this testimony may not eliminate all possible alternative explanations for the mold, "the Harrison test does not specify *how many* or *which alternative causes* must be eliminated in order for this factor to weigh in favor of the non-movant." *Gross v. DaimlerChrysler Corp.*, 2003 U.S. Dist. LEXIS 24673 at *14 (D. Md. 2003) (unpublished). Evidence that tends to eliminate the most probable alternative causes is likely sufficient. Viewing the above in the light most favorable to SMC, we find that the fourth factor weighs in its favor. *See Watson*, 816 F. Supp. at 388-89 (children's testimony that they were not playing with matches and parent's testimony that cords were unobstructed was enough at summary judgment stage to eliminate other causes of electric blanket fire).[9]

---

[9]Shoffner points to other possible causes by offering testimony from homeowners in which they allege that water infiltrated their homes during the construction process and that the weather during the construction period was particularly rainy. Although the Court has ruled that this testimony is inadmissible, we briefly note that it would not have affected our judgment even if it were considered. Testimony from a handful of individual homeowners, about several isolated incidents, is insufficient to account for mold growth that apparently affected all twenty-

Under the fifth factor we consider whether the "accident" that occurred at Quince Orchard Park is the type unlikely to occur without a product defect. Clearly, wood that grows mold at some point in its existence was not necessarily defective at the time it was sold. SMC essentially suggests that we must consider the fifth factor in parallel with the fourth – i.e., if we eliminate other causes of the accident, would it have occurred in the absence of product defect? As noted in *Watson*, this approach would add nothing to the *Harrison* test, because "if a product . . . is involved in an accident, and if all other possible causes of the accident are eliminated, the inference is almost inescapable that the product is defective." *Id.* at 389. The court in *Watson* read the fifth factor of *Harrison* to mean that "even if other causes are not eliminated, the accident is of a type that does not ordinarily happen unless a defect exists." *Id.* Adopting this interpretation, we find that, when other potential causes are not eliminated, mold growth is the type of "accident" that *can* occur in the absence of product defect. Therefore, the fifth factor weighs Shoffner's favor.

In sum, three of the *Harrison* factors favor SMC, one favors Shoffner, and one is neutral. Accordingly, the Court finds that SMC has presented sufficient circumstantial evidence to create a genuine issue of material fact as to whether the trusses were defective, thereby precluding the grant of summary judgment. *See Watson*, 816 F. Supp. at 389 (summary judgment denied when three factors favored plaintiffs, one favored defendant, and one was neutral).

In its reply brief, Shoffner argues that even if this Court finds the *Harrison* factors to be in SMC's favor, summary judgment must still be granted because "a manufacturing defect claim cannot be established by simply presenting evidence that the product is defective at the time it left

---

four homes and was largely isolated to the Shoffner trusses. Similarly, even if there was heavy rain at certain times during the construction period, this ignores the fact that construction of the homes (and delivery of the trusses) took place throughout the greater part of an entire year.

the manufacturer's control." *Shreve*, 166 F. Supp. 2d at 411. In order to survive summary judgment, a plaintiff must offer evidence that "the product at issue either was not manufactured in accordance with the product's design specifications or that during manufacturing process the [product] was assembled improperly or that some other error occurred." *Id.* Because SMC presented no evidence (i) delineating Shoffner's truss-manufacturing process and (ii) demonstrating that these particular trusses deviated from the norm, Shoffner argues that SMC is unable to make out a claim of manufacturing defect.

SMC, however, bases its claim on Shoffner's alleged negligence *after* the trusses had been manufactured. In particular, SMC alleges that, following their manufacture, the trusses were negligently stored out in the open, with no protection from the elements, and then transported uncovered on open trucks. Deposition testimony from Shoffner's corporate representative substantiates these allegations. Therefore, Shoffner's reliance on *Shreve* is unavailing, because SMC can cite to specific and potentially negligent conduct that took place after the trusses' fabrication.

## Contributory Negligence

A plaintiff's contributory negligence "operates as an absolute bar to recovery under Maryland law." *Major v. CSX Transp., Inc.*, 278 F. Supp 2d 597, 616 (D. Md. 2003) (citing *Harrison v. Montgomery County Bd. of Educ.*, 295 Md. 442, 451, 456 A.2d 894, 898 (1983). Contributory negligence "is that degree of reasonable and ordinary care that a plaintiff fails to undertake in the face of an appreciable risk which cooperates with the defendant's negligence in bringing about the plaintiff's harm." *Bd. of County Comm'rs v. Bell Atlantic-Maryland*, 346 Md. 160, 180, 695 A.2d 171 (1997) (citations omitted). The burden of proving contributory negligence rests with the defendant. *See Moodie v. Santoni*, 292 Md. 582, 586, 441 A.2d 323, 325 (1982). Although the

question of contributory negligence is ordinarily to be decided by the jury, it becomes a matter of law when reasonable minds could not differ on the outcome. *See Union Mem'l Hosp. v. Dorsey*, 125 Md. App. 275, 282, 724 A.2d 1272 (1999).

Shoffner alleges that SMC was contributorily negligent because its neighborhood construction manager, Mr. Pitman, failed to dry trusses after they had become exposed rainfall. SMC cites the following deposition testimony:

> Q: Now, did you do anything to the trusses after it rained that were installed in the houses?
> A: No.
> Q: How about the trusses that would have been on the job site that had not been installed would you do anything to those after it rained?
> A: No, because if they hadn't been installed yet they would have been covered.

Pitman Dep. at 189. Shoffner suggests that this testimony demonstrates a negligent failure to dry building materials after they had become wet. This excerpt, however, *fails to establish that the trusses were ever exposed to the rain*. In his second answer, Mr. Pitman is clearly saying that there was no need to dry the trusses on the construction site because they were "covered"; presumably, he means that they were protected from rainfall by the polyurethane sheeting mentioned in the Agreement and in other portions of his testimony. The first exchange also fail to establish negligence, because it does not demonstrate that the trusses "that were installed in the houses" had been exposed to the rain – they may have been protected by other building materials, or already been "under roof."

Shoffner also cites Mr. Pitman's lack of formal training "in the inspection of waterproofing, drain tiles, sump pumps, or the establishment of temporary grades to drain water away from the home." Def.'s Mot. at 20. Mr. Pitman has testified, however, that he has twenty-two years of experience in the construction industry and significant on-the-job training. Furthermore, Shoffner

has failed to demonstrate that Mr. Pitman's lack of formal training contributed to the mold growth on the trusses. Alluding to the claims of several homeowners who observed puddles and standing water in their basements is insufficient to demonstrate that Mr. Pitman's conduct was so unreasonable as to warrant a finding of contributory negligence as a matter of law, which requires "some prominent and decisive act which contributed directly to the . . . [incident] and which was of such a character as to leave no room for difference of opinion thereon by reasonable minds." *Campbell v. Montgomery County Bd. of Educ.*, 73 Md. App. 54, 64, 533 A.2d 9 (1987) (citations omitted). Reasonable jurors could differ over whether SMC's reliance on Mr. Pitman to conduct the waterproofing inspections constituted contributory negligence, as they could over the reasonableness of Mr. Pitman's precautions against rainfall (or lack thereof). Accordingly, the Court is precluded from granting summary judgment on the basis of SMC's alleged contributory negligence.

### Counts III, IV, and V

Shoffner does not directly challenge SMC's claims for contractual indemnification, common law indemnification, and contribution, arguing instead that SMC's failure to present legally sufficient evidence of product defect is fatal to its entire complaint. Because this Court finds otherwise, summary judgment on these counts will be denied.

### CONCLUSION

For the reasons stated above, SMC's Motion to Strike Inadmissible Evidence is GRANTED with respect to Shoffner Exhibits C (Deposition of Elizabeth Gensler), D (Deposition of Dana West), E (Deposition of Gary Gensler), F (Weather Chart), and H (Interrogatory Responses of Joseph Waks, Thomas Reddy, and Roland Selby).

Shoffner's Motion for Summary Judgment is GRANTED with respect to SMC's breach of contract claims, but only to the extent they may be based on Shoffner's failure to properly place and store the trusses; in all other respects, Shoffner's Motion for Summary Judgment is DENIED. An Order consistent with these rulings shall follow.

October 27, 2005
Date

/s/
Alexander Williams, Jr.
United States District Judge